**TOWER LEGAL GROUP, P.C.**
James A. Clark (SBN 278372)
Renee P. Ortega (SBN 283441)
11335 Gold Express Drive, Ste. 105
Gold River, CA 95670
Telephone: (916) 361-6009
Facsimile: (916) 361-6019
Email: james.clark@towerlegalgroup.com
Email: renee.parras@towerlegalgroup.com

**THE SHARMAN LAW FIRMt**
Paul Sharman *PHV pending
11175 Cicero Drive, Suite 100
Alpharetta, GA  30022
Telephone: (678) 242-5297
 Facsimile:  (678) 802-2129
 Email: paul@sharman-law.com
 (*Pro Hac Application Pending)

[Attorneys for Plaintiffs]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Diego Partida, individually and as a representative of a Putative Class of Participants and Beneficiaries, on behalf of the Schenker, Inc. 401(k) Savings and Investment Plan, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| SCHENKER, INC.; ADMINISTRATIVE COMMITTEE OF SCHENKER, INC. 401(K) SAVINGS AND INVESTMENT PLAN, BOTH INDIVIDUALLY AND AS THE DE FACTO ADMINISTRATIVE COMMITTEE MEMBERS; JOCHEN THEWES (CEO); OLIVER SEIDL (CFO), and DOES 1-50 as members of the Administrative Committee, | |
| Defendants. | |

## TABLE OF CONTENTS

INTRODUCTION ……………………………………………………………………3

JURISDICTION AND VENUE……………………………………………….….. 18

THE PARTIES………………………………………………………………….….... 19

Plaintiffs………………………………..……………………………...………… 19

Defendants…………………………………………………………..….……… 20

Standing ………………………..………………………….…………............. 22

Damages …………………………………………………………………………… 27

DEFENDANTS' FIDUCIARY OBLIGATIONS …………………..………….…….…….. 33

IMPACT OF EXCESSIVE FEES ON THE TRUST ……………………….….…… 35

FACTUAL ALLEGATIONS……………………………………………………….......37

    A.    EVERY ANNUAL RETURN/REPORT OF EMPLOYEE BENEFIT PLAN
        (FORM 5500) INDICATES BROKEN FUND AND PROVIDER SELECTION
        AND RETENTION PROCESSES…………..………………...………….. 41

    B.    DEFENDANTS NEVER INFORMED PARTICIPANTS OF LOWER COST,
        HIGHER YIELDING CLASSES OF THE SAME FUNDS WERE AVAILABLE
        (AT THE SAME TIME, THE DEFENDANTS CHOSE MORE EXPENSIVE
        AND LOWER YIELDING SHARE CLASSES) ………………….……...... 43

    C.    THE DUTY OF PRUDENT DELEGATION …………………………….. 46

    D.    SCHENKER PAID GREENLEAF ADVISORS LLC MUCH MORE THAN
        OTHER 401K CLIENTS ………………………………………….…..... 49

    E.    SCHENKER PREFERRED TO IGNORE FUNDS' PORTFOLIO MANAGERS'
        COSTS AND LACK OF SKILL TO FOCUS ON RECEIVING POTENTIAL
        KICKBACKS FROM SEC-REGISTERED MUTUAL FUNDS ……………… 51

    F.    EXCESSIVE FEES BEYOND NECESSARY AND REASONABLE TO

    G.    GREENLEAF ADVISORS LLC, THE PLAN ADVISOR ………..………. 68

CLASS ACTION COMPLAINT

H.    FAILURE TO LOYALLY SELECT AND MONITOR TRUST INVESTMENTS –

FAILURE TO PRUDENTLY INVESTIGATE, SELECT AND MONITOR

TRUST INVESTMENTS …………………………………………..…….. 72

I.    THE DEFENDANTS' CORE PROBLEM—SELF-DEALING ……………..... 94

J.    CLASS ACTION ALLEGATIONS…………………………………………… 97

K.    FIRST CAUSE OF ACTION VIOLATION OF 29 U.S.C. §§ 1104(A)(1)(B) AND

1105 (LIABILITY FOR BREACH OF CO-FIDUCIARY; DUTY OF PRUDENCE).. 100

L.    VIOLATION OF 29 U.S.C. §§ 1104(A)(1)(A) AND 1105  (LIABILITY FOR

BREACH OF DUTY OF LOYALTY) …………………………………..……….... 105

M.    THIRD CAUSE OF ACTION FAILURE TO MONITOR OTHER PLAN

FIDUCIARIES ……………………………………………………….……. 108

N.    FOURTH CAUSE OF ACTION BREACH OF FIDUCIARY DUTY BY

OMISSION …………………………………………………………………. 109

O.    PRAYER FOR RELIEF……………………………………………..……… 115

CLASS ACTION COMPLAINT

1.    Plaintiff Diego Partida, individually and as representative of participants and beneficiaries, (collectively "Plaintiffs"), of the Schenker, Inc. 401(k) Savings and Investment Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§1001 et seq., on behalf of the Plan against the Plan sponsor (and its delegates and de facto responsible plan fiduciaries (RPF)).

2.    ERISA defines a "fiduciary" as a person (1) who exercises discretionary authority or control respecting management of the plan or management or disposition of plan assets; (2) who renders or has the authority or responsibility to render investment advice for compensation regarding money or property of the plan; or (3) who has discretionary authority or responsibility in the administration of the plan. 29 U.S.C. 1002(21)(A).  The term "party in interest" includes, inter alia, any fiduciary, counsel, or employee of a plan; a person providing services to the plan; an employer or employee organization any of whose employees or members are covered by the plan; a corporation or other entity that is owned by such a person; an employee, officer, or director of, or owner of a specified financial interest in, such a person; and a partner or joint venturer of such a person.  29 U.S.C. 1002(14).

3.    Based on government filings at www.efast.dol.gov., Schenker, Inc. (also DB Schenker, Inc.; hereinafter "Schenker") sponsors Schenker, Inc. 401(k) Savings and Investment Plan (hereinafter the "Plan").

4.    DB Schenker, Inc./Schenker, Inc. Defendants, the Trust Settlor and Plan Sponsor of the Plan was and remained the named fiduciary of the Plan under ERISA § 402(a)(2), the Plan administrator under ERISA § 3(16), a party in interest under ERISA § 3(14)(A), the de facto Investment Committee of the Plan, and also a Plan fiduciary under ERISA § 3(21)(A) to the extent that it appointed Investment Managers for the Plan, selected and monitored Investment Funds under the Plan, and otherwise exercised discretion or control over the administration and management of the Plan and Plan assets.

5.      During the Class Period, each of the Plan Fiduciaries was a fiduciary of the Plan, either as a named fiduciary or as a de facto fiduciary with discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets. DB Schenker, Inc./Schenker, Inc. was also the de facto administrator or co-administrator of the Plan for purposes of the required disclosures under trust laws and ERISA.

6.      Under the relevant ERISA provisions, "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). Subsection one imposes fiduciary status on those who exercise discretionary authority, regardless of whether such authority was ever granted; [s]ubsection three describes those individuals who have actually been granted discretionary authority, regardless of whether such authority is ever exercised.

7.      In a recent Law Review article on the subject, the authors stated: ". . . The term [fiduciary] includes anyone who exercises discretion in the management of assets, renders investment advice for a fee, or possesses discretionary authority with regard to plan administration. The broadness of the definition is readily apparent. Plan officers, directors, and members of the investment or administrative committee are certainly fiduciaries since they exercise discretionary authority or control over plan management and asset disposition. Similarly, officers and directors of the plan sponsor are fiduciaries if they exercise control through the selection of the investment committee, administrative committee, or plan officers or directors. Because the definition includes those who render investment advice for a fee, the following persons may be considered fiduciaries: . . . attorneys who counsel the employer, investment committee, or trustee with regard to an appropriate portfolio

mix or with regard to specific investments and receive a fee for these services; . . . [and] . . . stock brokers or dealers who recommend certain securities and then participate in the acquisition or disposition of these securities and receive a commission for their services. (Footnotes omitted.) (see Little and Thrailkill, Fiduciaries Under ERISA: A Narrow Path to Tread, 30 Vanderbilt L.Rev. 1, 4-5 (1977)).

8.      Wasting the trust's money (i.e., participants/beneficiaries' salary savings) violates subsections (A), (B) and (D) of ERISA Section 404(a)(1). In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to "minimize costs." Uniform Prudent Investor Act (the "UPIA") §7. Courts have quoted commentary to section 7 of the Uniform Prudent Investor Act: "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obliged to minimize costs."

9.      Defendants include, but not limited to, Schenker, Inc., EIN: 13-5619239, 1305 Executive Blvd Ste 200, Chesapeake, VA 23320; phone: 757-821-3400, Mr. Jochen Thewes, Chief Executive Officer, jochen.thewes@dbschenker.com; Ms. Katharina Rath, Human Resources, katharina.rath@dbschenker.com; Mr. Oliver Seidl, CFO, oliver.seidl@dbschenker.com (Oliver Seidl, Chief Financial Officer of Schenker AG https://www.dbschenker.com › global › about › press, Jul 25, 2016 — Oliver Seidl is set to join the Management Board of Schenker AG in Essen as the new Chief Financial Officer following his appointment); Schenker, Inc. 401(k) savings and investment plan Signer of 5500 Ms. Cynthia DeGalleford, Director Benefits, USA at DB Schenker, Inc.

## **INTRODUCTION**

10.      This action is brought by current and former participants/beneficiaries of the Plan to recover mismanaged 401k retirement funds. The 401k plan has

become the dominant source of retirement savings for most Americans. Unlike defined-benefit pensions, which provide set payouts for life, 401(k) accounts rise and fall with financial markets, and therefore, the proliferation of 401(k) plans has exposed workers to big drops in the stock market and high fees from Wall Street money managers. This action is filed to recover in excess of $50M in trust funds owed back to the Plan and Trust on behalf of participants/beneficiaries. These retirement funds are significant to the welfare of the class.

11.    Federal law affords employers the privilege of enticing and retaining employees by setting up retirement and defined contribution plans pursuant to 26 U.S.C. §401 ("401(k) plans). These plans provide employees investment options with tax benefits that inure to the benefits of the employees and, necessarily, to the employers by increasing the "net" compensation their employees receive via tax deferment. To enjoy this benefit, employers must follow the rules and standards proscribed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et. seq.* ("ERISA").

12.    Defendants (Schenker and other de facto responsible plan fiduciaries) chose to seek and accept the benefits of federal and state tax deductions from their employer contributions as well as for their employees via a 401(k) plan, and the corporation, its owners and executives have benefitted financially for years from the same tax benefits. However, Defendants have not followed ERISA's standard of care. This lawsuit is filed after careful consultation with experts and publicly available documents to return benefits taken from Plan participants by Defendants.

13.    The Plan at issue is a defined contribution retirement plan or a 401(k) plan, established on July 1, 1980, pursuant to 29 U.S.C. §1002(2)(A) and §1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. As of December 31, 2021, the Plan had 9,778 participants with account balances and $442,385,155 in assets.

CLASS ACTION COMPLAINT

14.     The current plan sponsor is Schenker, Inc. The Schenker, Inc. 401(k) Savings and Investment Plan (the "Plan") is a defined contribution plan, which is available to employees after two months of service if they are expected to complete one year of service. The Plan defines an "employee" as any person employed by Schenker, Inc. (the "Company" and "Plan Administrator") or any affiliated company that has adopted the Plan. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA") as amended. Administration: The Plan is administered and overseen by the Schenker, Inc. 401(k) Savings and Investment Plan Administrative Committee (the "Committee"). Transamerica Retirement  Solutions Corporation ("TRSC") is the Plan record keeper and State Street Bank and Trust Company ("SSBT") is the custodian of all investments. Investment options are made available through TRSC and Transamerica Financial Life Insurance Company ("TFLIC"), an affiliate of TRSC. TFLIC manages and maintains the guaranteed investment contract and variable annuity accounts. Eligible employees may contribute from 1% to 100% of their salary up to the maximum percentage of compensation and dollar amount permissible under the Internal Revenue Code.

15.     When participants meet the eligibility requirements, they will be automatically enrolled to defer 3% of their compensation unless they go online to change this automatic election. Participants who are automatically enrolled will have their balances automatically increased by 1% each year unless they go online to change this automatic increase.

16.     Under ERISA section 3(21)(A)(ii), a person is considered a fiduciary with respect to an employee benefit plan to the extent that person "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority to do so . . . ." Section 3(21)(A)(ii) applies to advice with respect to "any moneys or other property" of a plan.

CLASS ACTION COMPLAINT

17.    Participants in the Schenker, Inc. 401(k) Savings and Investment Plan may only elect to invest their (1) deferred salary savings, (2) associated employer match and (3) reinvested dividends/interest among approximately fourteen investments chosen by the responsible plan fiduciaries, de facto fiduciaries and the Administrative Committee (not counting default target date funds chosen for the workers who make no investment election). Schenker's decision-making was aided by and under the recommendations of Greenleaf Advisors LLC who was compensated handsomely for poor recommendations in violation of ERISA and Restatement (Third) of Trusts.

18.    The plan fiduciaries include, but are not limited to, the de facto fiduciaries and board members overseeing the Committee members. Schenker not only controls the participants'/beneficiaries' investments (and related growth which adds two-thirds to retirement wealth; via an Investment Policy Statement (IPS) it failed to share upon written requests when required by ERISA (the Investment Policy Statement (IPS) is considered a governing plan document per *Tussey v. ABB, Inc*., No. 06-4305, 2015 WL 8485265, at *2 (W.D. Mo. Dec. 9)). Schenker also controls all relationships (broker, recordkeeper, custodian, auditor, etc.).

19.    Schenker alone has full discretion over compensation for the Plan's chosen and retained providers. Schenker made few, if any, covered service provider changes over the past decade and very few mutual fund changes also. Morningstar data (as of 6/30/2022 and earlier) indicates that the median portfolio manager tenure is eight (8) years. Thus, statistically speaking, fifty percent (50%) of the Defendants' chosen funds' managers are fired or quit every four years and so twenty-five percent leave every two years.

20.    Prudent monitoring of funds using portfolio managers should mean three or four funds are being reviewed for replacement each year if Schenker uses typical criteria of standard Investment Policy Statements (IPS) (not offered to Plaintiffs upon their written request).

21.   For example, here is a sampling of language of some similar-sized plans' policy statements that solidifies this point. Three years is the common denominator for ensuring managers have experience in running a fund's money:

- Fi360: "Managers must have verifiable/audited returns for three years."
- Vanguard: "The performance of professional investment managers hired on behalf of the portfolio will be judged against the following standards: 'A market-based index appropriately selected or tailored to the manager's agreed-upon investment objective and the normal investment characteristics of the manager's portfolio.'"
- Fidelity: "The performance of each investment option will be compared against recognized appropriate indexes."
- Fidelity: "Portfolio manager with tenure of three years or more."

## SCHENKER, INC. FAILED TO PRUDENTLY SELECT AND MONITOR THEIR FUNDS

22.   Fidelity states that one out of five Americans have their 401k accounts recordkept by their firm so their recommended criteria for investment management carries weight. These selection and retention criteria are required to be met for the fund to stay in the plan. So when an untested, new fund manager takes over, as 50% will do every four years, a replacement fund should be considered. This was not done by the responsible plan fiduciaries running this Plan and Trust.

23.   Greenleaf Advisors LLC was paid by Schenker to babysit a dozen and a half poorly selected investment options whose portfolio manager's compensation was taken from employees but was not earned over many years.

## SCHENKER, INC. REPEATEDLY FAILED TO MONITOR THEIR FUNDS' PORTFOLIO MANAGERS

24.   Schenker's repeated actions to dismiss periodic investigations into funds' portfolio managers caused a great deal of harm—both during initial selection and later during periodic monitoring. Based on the Schedules of Assets certified to

the U.S. Departments of Treasury and Labor, Schenker instead spent a great deal of time and made great efforts to focus on receiving revenue sharing credits. It is important to note that Schenker controlled the revenue sharing ERISA budget spending account at all times via services agreement with their recordkeeper.

25.     That means Schenker solely decided what rebates were kept by providers and what was left to be credited to participants' accounts after three to six months from deductions (from participants'/beneficiaries' accounts).

## SCHENKER AND ITS DE FACTO FIDUCIARIES FAILED TO MONITOR PROVIDERS

26.     Fiduciaries of ERISA-covered plans who retain service providers like Schenker to assist in administering their plans are required to monitor their service providers on a regular basis to ensure that the Plans and their assets are being administered prudently, solely in the interest of the Plans' participants and beneficiaries, and in accordance with documents and instruments governing the Plans. See 29 U.S.C. § 1104(a)(1)(A), (B) and (D). Plan fiduciaries are prohibited from continuing to contract with service providers, which are parties in interest to ERISA-covered plans unless the services are necessary for the operation of the Plans and the service provider's compensation is reasonable and disclosed. See 29 U.S.C. §§ 1002; 1106(a)(1)(C), 1108(b)(2). Plan fiduciaries can be held personally liable for any losses to the Plans resulting from the failure to comply with these fiduciary duties and may be subject to other equitable remedies. See 29 U.S.C. §§ 1152(a)(2), 1109(a). When service providers are also fiduciaries, plan fiduciaries can also be held liable for any losses caused by the service provider's fiduciary breaches if they knowingly participate in the breach, enable the breach, or have knowledge of the breach but fail to correct it. See 29 U.S.C. § 1105(a)(2).

//

//

//

## SCHENKER'S CEO AND CFO REPEATEDLY AUTHORIZED EXCESSIVE QUARTERLY COMPENSATION TO GREENLEAF ADVISORS LLC

27.    To the extent that Schenker is or was paying providers more than reasonable compensation, it is or was breaching its fiduciary duties of loyalty and prudence and not acting in accordance with the Plan documents and the agreements governing the Plans. To the extent that Schenker approved and aided in alienating or diverting Plan and Trust assets designated for the payment to separated participants, Schenker is and was violating the same requirements and is also self-dealing in violation of ERISA's prohibited transaction rules.

28.    Based on information and belief, Cynthia Degalleford certified annually this was "true/correct/complete" even though the services under their services agreement for Greenleaf Advisors LLC, remained precisely the same each year. Advisors do not execute new advisory contracts each year. She certified this even though Greenleaf's services violated ERISA (since Greenleaf's services were "not necessary for operation" of the Schenker, Inc. 401(k) Savings and Investment Plan). Greenleaf's "detrimental investment recommendations" of identical higher cost share classes, when a cheaper identical one was readily available, harmed the trust and participants/beneficiaries repeatedly over and over again for many years. The word "identical," when used contextually in a sentence about mutual funds, means "of the same RIC (registered investment company), and the same manager, same fund holdings, etc. The only difference  lies with the share classes or fund's expense ratio."

29.    In their 2015 unanimous Tibble v. Edison decision, the U.S. Supreme Court clarified that limitation periods do not apply to initially imprudent investment selections and subsequent imprudent monitoring. Greenleaf Advisors LLC's services were not "necessary for plan operation"--therefore, their compensation is not exempt from ERISA Section 408(b)(2) (because their time/labor was actually "detrimental" (no "benefit" to participants'/beneficiaries' accounts when they selected/retained high

cost and low yielding investments since 2016 and before)). Greenleaf's actions were in violation of the recent case (Hughes v. Northwestern University, No. 19-1401 (U.S. Jan. 24, 2022))—this Court clarified selection/retention duties under ERISA.

30.    Greenleaf's actions/flawed processes repeatedly harmed the Plan and Trust and their pay amounts from the trust/participants'/beneficiaries' accounts paid came from every single one of the Schenker, Inc. workers (at a rate of almost eight times the pay of a full-time Schenker worker ($17.47 per hour ($34,940/yr) for Van Driver to $21.66 per hour ($43,320/yr) for Truck Driver; www.indeed.com)).

31.    The Restatements (Second (1959) and Third (1992)) stated duty to avoid unreasonable or inappropriate costs requires particular attention to such matters as the fees of agents and advisors. (See § 227 cmt. m and Reporter's Notes to that comment; Restatement Second, supra note 7, § 188 cmts. c, f.). "*** The objective is simply to require close attention by trustees/fiduciaries to the increasingly important investment applications of the more general and traditional duty to avoid unwarranted costs."

## MAKE-WHOLE RELIEF RELEVANT TO CURRENT AND FORMER/TERMINATED SCHENKER, INC. WORKERS

32.    "[T]he liability of a trustee who is sued and found to have committed a breach of trust is the amount required to restore the values of the trust estate and its distributions to what they would have been if the affected portion of the trust estate had been properly administered." (Restatement (Third) of Trusts § 100, cmt. b (2012); see also Restatement (Third) of Trusts: Prudent Investor Rule § 205 (1992); Restatement (Second) of Trusts § 205 (1959); Bogert, Trusts and Trustees § 862 (2d ed. rev. 1995)).

33.    Schenker, Inc. and Greenleaf's harm also impacted thousands of former and terminated workers from earlier plan years who had accounts that used expensive mutual funds with lower yields and returns—based on Schenker, Inc.'s

trust's audited financial statements, their "harm" was never addressed by Schenker, Inc. or Greenleaf.

34.    But for Schenker, Inc. and Greenleaf's actions, former workers' cash-out final payments would have been higher (if Defendants' processes were to buy higher-yielding, lower-cost share classes of the same funds). Former workers' prior accounts' distributions since at least 2009 were never "restored to the position they would have been had the Defendants' repeated breaches not occurred" as required by ERISA § 409 and common trust law. (Restatement (Third) of Trusts (2012).

35.    If the trustee improperly purchases investments for the trust estate, the beneficiaries: (a) may charge the trustee with the amount of trust funds expended in the purchase plus or minus the amount of a reasonably appropriate positive or negative total return thereon; or (b) may either affirm the purchase or, if the improperly purchased property has already been sold, require the trustee to account for the proceeds and return traceable to that property. Restatement (Third) of Trusts: Prudent Investor Rule § 210(1) (1992); see also Restatement (Third) of Trusts §§ 100, 100 cmt. b (2012); Restatement (Second) of Trusts §§ 210, 207(1) cmt. c (1959); Scott and Ascher on Trusts § 24.13 (5th ed. 2007); Bogert, Trusts and Trustees § 862 (2d ed. rev. 1995).

36.    Since 2015, harmed terminated former workers of Schenker, Inc. were paid 216,505,424 dollars in trust investment benefit payments (i.e., trust corpus (fund) liquidations) from the trust's "impaired" assets at the time of request (based on Schenker, Inc.'s Schedule H, line 2e(1)).

37.    Defendants chose/kept funds (1) with underperforming portfolio managers as well as (2) expensive share classes with depleted net asset values (NAVs; due to daily SEC Rule 12b-1 fees, sub-transfer agency fees, shareholder servicing fees, or other types of fees) compared to identical related "sister" classes of funds. Consequently, former workers' payments were less than ERISA and Schenker, Inc.'s plan documents (and Summary Plan Descriptions (SPD)) stated and

1   required under common trust law. An ERISA fiduciary who harms or abuses plan
2   assets (e.g., by negligent investing) must make the plan whole by paying either
3   damages or restitution. (ERISA § 409(a), 29 U.S.C. § 1109(a)).

4       38.    While "equitable restitution" is unique to trusts, the analogy that comes
5   to mind quickest is to shareholder derivative litigation. However, trust-law roots of §
6   1132(a)(2) run far deeper. When a common-law trustee commits a breach of trust
7   that results in a loss, any beneficiary whose beneficial interests were affected may
8   sue to compel the trustee to make good on the loss. When the trustee does so, he
9   restores money to the trust for the benefit of the plaintiff/beneficiary. Restatement
10  (Second) of Trusts § 214 & cmt. b (1959). See Austin W. Scott & William F.
11  Fratcher, The Law of Trusts § 214 (4th ed. 1988); P.V. Baker & P. St. J. Langan,
12  Snell's Equity 284 (29th ed. 1990) (citing Bartlett & Others v. Barclay's Bank Tr. Co.
13  Ltd., [1980] Ch. 514, 543).

14
15          . . .the amount required to restore the value of the trust property and trust
            distributions to what they would have been had the breach not occurred.
16  Unif. Tr. Code  § 1002(a)(1).
17

18      39.    Thus, § 1132(a)(2) merely codifies for ERISA participants and
19  beneficiaries a classic trust-law process for recovering trust losses through a suit on
20  behalf of the trust. The Supreme Court's *Amara v. Cigna* (2011) and *LaRue v.*
21  *DeWolf* (2008) decisions affirm this fact.

22      40.    When combined with ERISA Section 409 requirements (ERISA section
23  409(a) imposes personal liability on fiduciaries that breach their fiduciary duties),
24  restoration of the Defendants' harm to the Plan and Trust dovetails with the pure
25  form of the continuing violations doctrine and each element here avoids giving the
26  Defendants a "license" to perpetuate its misconduct.

27      41.    Plaintiffs believe "a continu[ous] series of events gives rise to a
28  cumulative injury." That is the gravamen of our specific claims at issue—

participants/beneficiaries seek the trustee/fiduciary to restore all trust damages under the laws of equity so that the Plaintiffs' accounts would reach the same levels as if the breaches never occurred. Such is analogous to treating the claim as continuing in nature. (See Kyle Graham, "The Continuing Violations Doctrine," Vol. 43 p 293, Gonzaga Law Review (2008)).

42.    Accordingly, as permitted under Section 409 of ERISA, Plaintiffs are entitled to the full range of equitable relief against Schenker And the Committee (and members), including, without limitation, requiring Schenker to do the following: (a) disgorge any plan assets taken from the Plan and Trust that were not used to pay Plan participants and beneficiaries and (b) restore losses to the Plan resulting from Schenker and responsible plan fiduciaries' imprudent practices of using plan assets to pay more than the reasonable rate to providers; (c) and provide "such other equitable or remedial relief as the court may deem appropriate, including removal of [Schenker as an ERISA] fiduciary." 29 U.S.C. § 1109(a).

43.    ERISA imposes strict fiduciary duties of prudence and loyalty on covered retirement plan fiduciaries. An ERISA fiduciary must discharge his responsibility "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1). A plan fiduciary must act "solely in the interest of [plan] participants and beneficiaries." *Id*. A fiduciary's duties include "defraying reasonable expenses of administering the plan," 29 U.S.C. § 1104(a)(1)(A)(ii), and a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

44.    Repeated imprudent monitoring was exhibited after selection and continuing into the limitations period (based on the fact that the Defendants never removed the imprudent fund after their initial selection).

45.    The Supreme Court held that the fiduciary duty identified in the Tibble case was continuing in nature, and that each new breach began a six-year limitations

period under § 1113. The Court recognized the breach as "a fiduciary's allegedly imprudent retention of an investment" which results in a series of related breaches as the investment is retained over time. *Tibble IV*, 135 S.Ct. at 1826, 1828–29.

46.    As the Court made clear, only a "breach or violation," such as a fiduciary's failure to conduct its required regular review of Plan investments, need occur within the six-year statutory period; the initial investment need not be made within the statutory period. Id. at 1827–28.

**SCHENKER COMMITTED FREQUENT VIOLATIONS OF ERISA § 404(A)(1)(A), 29 U.S.C. § 1104(A)(1)(A) AND ERISA § 404(A)(1)(B), 29 U.S.C. § 1104(A)(1)(B)**

47.    Since 2009, Schenker annually sent government filings to the U.S. Departments of Treasury and Labor that are evidence of violations of ERISA and trust laws' fundamental duties to (1) act solely in the interest of participants and beneficiaries and for the exclusive purpose of providing benefits to them and defraying administrative costs, as well as (2) the duty of prudence and the duty to invest prudently and the duty to investigate and the duty to prudently select service providers.

48.    This case is another example of a large plan filling its 401(k) plan with (1) lower yielding, expensive investments when identical, cheaper classes were available at the time of selections/retentions, while (2) overpaying covered service providers when the Defendants' chosen funds' SEC-prospectuses (at www.sec.gov/edgar) waived minimum purchase amounts for "qualified retirement plans (QRP) and "omnibus trusts." Specifically, the Sponsor, the board, the Committee, and individual delegates, along with Greenleaf Advisors LLC, breached their fiduciary duties of prudence and loyalty to the Plan by:

- Offering and maintaining higher cost share classes when identical lower cost class shares were available and could have been offered to participants;
- Overpaying an unnecessary advisory firm (Greenleaf Advisors LLC) by alienating trust assets, which exceeded trust direct and indirect costs incurred by plans of similar size with similar services;

- Failure to prudently choose and monitor covered service providers and other plan fiduciaries;
- Other breaches of fiduciary duties.

49.    Although not currently named here, the Plaintiffs reserve the right to name Greenleaf Advisors LLC as a defendant. Schenker, Inc. and Greenleaf Advisors LLC must: (l) conform to fundamental fiduciary duties of loyalty (§ 170) and impartiality (§ 183); (2) act with prudence in deciding whether and how to delegate authority and in the selection and supervision of agents (§ 171) and (3) incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship (§ 188).

50.    Greenleaf Advisors LLC disclosures at the U.S. Securities and Exchange Commission (SEC) adviser search website and at the Financial Industry Regulatory Authority (FINRA) broker check website indicated that it possessed many potential conflicts of interest. Based on information and belief, the Defendants never read them for years. Greenleaf Advisors LLC contract was not supplied upon written requests but based on its government disclosures, it does not profess to serve with discretion under ERISA § 3(38)—it may, like many other retirement plan advisory firms, that its role may fall under the functional fiduciary realm of ERISA § 3(21). This is the defense in similar complaints against many of its peers. This is often supported by recordkeeper failing to accept fund change instructions by only the named fiduciary for the plan or by the corporation sponsoring the plan.

51.    So, for Schenker to pass the baton of plan-level investment advisory discretion to another properly delegated "discretionary fiduciary" means that the recipient must have zero conflicts with participants which is not the case here. ERISA imposes a "limited duty" upon written appointment to another unconflicted fiduciary and this prudent delegation leaves the appointer with "limited duties to "monitor and review the performance of their appointed fiduciaries" and ensure that they are ensuring their fiduciary obligations. (See *In re Comput. Scis. Corp. Erisa Litig.*, 635 F. Supp. 2d 1128 , 1144 (C.D. Cal. 2009))

**SCHENKER HAD A DUTY TO MONITOR GREENLEAF ADVISORS LLC**

52.     An appointing fiduciary "must act with prudence in supervising or monitoring the agent's performance and compliance with terms of delegation." (see Restatement (Third) of Trusts § 80 cmt. D(2); Marshall, [2019 BL 328678], 2019 U.S. Dist. LEXIS 149162 , at *23-24).

53.     The appointing fiduciaries should "review the performance of their appointees at reasonable intervals and in such a manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards." (See *In re Comput. Scis.*, 635 F.Supp.2d at 1144 (internal quotations omitted) (citing *In re Syncor ERISA Litig.*, 410 F.Supp.2d 904 , 912 (C.D. Cal. 2006))).

54.     Where an appointing fiduciary is aware of their appointee fiduciaries' conflicting loyalties, the appointing fiduciary is obligated to take "prudent and reasonable action" to determine whether they are fulfilling their obligations. (See *Leigh v. Engle*, 727 F.2d 113 , 135-36 (7th Cir. 1984)).

**SINCE THE PLAN'S INCEPTION, SCHENKER CONTROLLED ALL SETTLOR AND ADMINISTRATIVE FUNCTIONS, INCLUDING ADDING/REMOVING INVESTMENTS AND PROVIDERS**

55.     "[I]n a defined contribution plan, … the retirees' benefits are typically tied to the value of their accounts," *Thole v. U.S. Bank*, 140 S. Ct. 1616, 1618 (2020), and "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). Therefore, "benefits can turn on the plan fiduciaries' particular benefit decisions." *Thole*, 140 S. Ct. at 1618.

56.     Indeed, Plan participants bear not only the investment risk of Plan administrators' decisions but also the costs of any excessive investment and covered service providers' expenses as well.

57. Plaintiffs were injured during the Relevant Time Period by the Defendants' lack of loyalty, imprudent skill and flawed processes in breach of their fiduciary duties. As a result of the Defendants' actions, participants paid additional unnecessary operating expenses offering no value to the participants and resulting in a repeated daily loss of compounded returns.

58. Plaintiffs, individually and as the representatives of a putative class consisting of the Plan's participants and beneficiaries, bring this action on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3) to enforce Defendants' liability under 29 U.S. C. §1109(a), to make good to the Plan all losses resulting from their breaches of fiduciary duties, and to restore to the Plan any lost profits. In addition, the Plaintiffs seek to reform the Plan to comply with ERISA and to prevent further breaches of fiduciary duties and grant other equitable and remedial relief as the Court may deem appropriate.

59. The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and Trust. Each Plaintiff represented the Plan and Trust and was harmed by the Defendants' (1) plan-wide flawed investment decision-making processes as well as (2) trust overpayments to covered service providers' (levied on each participant's account).

60. As stated by (1) ERISA, (2) Schenker's IRS-approved tax-exempt prototype plan and (3) certified annual reporting to the U.S. Departments of Treasury and Labor, the participants'/beneficiaries' accounts are essentially "bookkeeping" accounts maintained by the recordkeeper.

61. The "trust" is the legal owner of all mutual funds and other assets. It is well settled that a trust differs: "from a contract creating a mere personal obligation * * * .

## SCHENKER, INC. 401(K) SAVINGS AND INVESTMENT PLAN'S TRUST IS THE "HOLDER OF RECORD" FOR ALL PLAN ASSETS—NOT PARTICIPANTS

62.     This complaint is about Plaintiffs having standing and other participants having representation under Section 502(a)(2) (which incorporates § 409(a)), which states that fiduciaries who are found liable for breach of their fiduciary duties must make good *to the plan* for any losses resulting from that breach. 29 U.S.C. §§ 1109(a), 1132(a)(2).

63.     Therefore, although the Secretary of Labor, participants, beneficiaries, and fiduciaries all have standing to bring a civil action against an ERISA fiduciary, any resulting awards are paid to the plan as a whole, rather than to the party who brings the suit.  "The beneficiary of a trust has an equitable interest in the subject matter of the trust." (See Restatement (Second) of Trusts § 74 cmt. a (1959); see id. § 197 cmt. b ("The creation of a trust is conceived of as a conveyance of the beneficial interest in the trust property rather than as a contract.").

64.     It is well settled that a trust beneficiary could sue to restore to the trust corpus any losses that she could prove the fiduciary breach caused. Common-law authorities did not require an individual financial loss to the beneficiary. Rather, what mattered was loss to the trust. *Thole v. U. S. Bank N.A.,* 140 S. Ct. 1615 (2020)).

### JURISDICTION AND VENUE

65.     Plaintiffs bring this action pursuant to 29 U.S.C. §1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

66.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the

1  United States, and exclusive jurisdiction under ERISA §502(e)(1), 29 U.S.C.
2  §1132(e)(1).

3      67.    This Court has personal jurisdiction over Defendants because it
4  transacts business in this District, resides in this District, and/or has significant
5  contacts with this District, one or more Plaintiffs reside and were employed in this
6  District, and because ERISA provides for nationwide service of process.

7      68.    Venue is proper in this District pursuant to ERISA §502(e)(2), 29
8  U.S.C. §1132(e)(2). Because the Plan is administered in this District, many
9  violations of ERISA took place in this District, and Defendants conduct business in
10 this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391(b)
11 because Plaintiffs were employed in this state and in this District and a substantial
12 part of the events or omissions giving rise to the claims asserted herein occurred
13 within this District.

14                         **THE PARTIES**
15                         **PLAINTIFFS**

16     69.    Plaintiff Diego Partida resides in the State of California, and was an
17 employee of Defendant Schenker, located in this District of California, and
18 interacted in performance of his duties as an employee in this District. Partida was a
19 participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period
20 and upon information and belief invested in some or all of the funds which are at
21 issue in this action.

22     70.    Partida and others (Plaintiffs) have standing under 29 U.S.C.
23 §1132(a)(2) to bring this action on behalf of the Plan because Defendants' reckless
24 and flawed actions caused actual harm to an ERISA plan in which the Plaintiffs
25 participate. Plaintiffs suffered an injury in fact by investing in the under-performing
26 and more expensive mutual fund shares when more prudent options were readily
27 available, by paying excessive fees to Covered Service Providers and investing in a
28 menu of options with high risk and lower yield and under performance versus a

                              -19-

meaningful benchmark. Defendants are liable to the Plan to make good the Plan's losses under 29 U.S.C. § 1109(a).

### DEFENDANTS

71.    Defendant Schenker ("Company") is the current sponsor and administrator of the Plan and maintains its principal place of business at 1305 Executive Blvd ste 200, Chesapeake, VA 23320. This entity is registered with the State of California and conducts business in the State of California.  The former fiduciary investment adviser was Greenleaf Advisors LLC. Upon information and belief, ONEDIGITAL LLC assumed all rights, property, debts and liabilities of Greenleaf Advisors LLC upon merger and transfer.

72.    The Company Defendants, acting through its Board of the Directors of appointed the Retirement Plan Committee of the Schenker, Inc. 401(k) Savings and Investment Plan to control and manage the operation and the administration of the Plan.  Accordingly, the Company (and named fiduciary) had a concomitant fiduciary duty to prudently select, monitor and supervise those appointees/delegates.

73.    Defendant "Does" or the names of the individuals on the Board of Directors and Committee during the Relevant Time Period are unknown at this time and are named as "John Does" until the "Does" are known and can be named through an amendment to this Complaint.

74.    Upon information and belief, Cynthia Degalleford (Director Benefits, USA at DB Schenker, Inc.), certified to the U.S. Departments of Treasury and Labor all of the Company's 2015 to 2021 plan years' Annual Returns/Reports of Employee Benefit Plan (Forms 5500; at www.efast.dol.gov).

75.    Schenker failed to prudently investigate and monitor its covered service providers. For example, Greenleaf Advisors LLC's median pay for every client since 2016 at www.efast.dol.gov, for every year from 2016 to 2021, was $42,640. This matches Fee Benchmarker® (Advisor Fee Almanac, 6th Edition, 2017) hourly of

1    $300 when performing about ten hours of labor each quarter running reporting for
2    the Plan and Trust.

3         76.    However, as Form 5500 Signatory since 2016, Ms. Degalleford certified
4    there were no excessive *trust* payments (from participants'/beneficiaries'
5    bookkeeping accounts) to Greenleaf Advisors LLC for those plan years (Schedule H,
6    line 4d) even though Greenleaf Advisors LLC was paid directly from the Plan and
7    Trust assets (and participants'/beneficiaries' accounts) 300,759 dollars for each plan
8    year ($1,722,856 in total taken from the trust and employees).

9         77.    The Committee members, in their capacity as officers of the
10   corporation, had discretionary authority to control the operation, management, and
11   administration of the Plan and should have followed the plan document's IRS
12   Employee Plans Compliance Resolution System (EPCRS) and Voluntary Fiduciary
13   Correction Program (VFCP) procedures and restored the trust back to the condition it
14   would have been in but for the alienation of excessive compensation (from trust
15   assets) to Greenleaf Advisors LLC in violation of the plan's document and ERISA
16   (and it foundation in common trust law). Based on information and belief, the
17   Company certified to Crowe LLP (the plan's auditor) that the financial statements
18   had zero accrued receivables while Mr. Oliver Seidl, Chief Financial Officer,
19   repeatedly directed quarterly payments to Greenleaf (per their ERISA violating
20   signed agreements with both the recordkeeper and Greenleaf).

21        78.    The Committee contracted with Greenleaf Advisors LLC ("Greenleaf"),
22   to serve as the Plan's Financial Advisor as stated in the Defendants' Schedules C
23   (service code 27) on their certified Forms 5500.

24        79.    The Company, and its Board of Directors, members of the Committee,
25   the Directors and Officers, along with signatories to the IRS Form 5500, and
26   Greenleaf are all fiduciaries to the Plan under 29 U.S.C. §1002(21)(A)(i) and (iii)
27   because they have sole authority to amend or freeze or terminate, in whole or part,
28   the Plan or the trust, and have discretionary authority to control the operation,

management and administration of the Plan, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their salary savings and provision of their retirement income.

## STANDING

80. ERISA permits an individual participant in a retirement savings plan to initiate litigation on behalf of the plan and other participants. 29 U.S.C. § 1132(a)(2) (allowing for "a participant" to bring a civil action "for appropriate relief" under ERISA); *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134 , 142 n.9, 105 S. Ct. 3085 , 87 L. Ed. 2d 96 (1985) (explaining the purpose of the ERISA enforcement statute and describing "Congress' intent that actions for breach of fiduciary duty be brought in a representative capacity on behalf of the plan as a whole"). Generally, a plaintiff has the standing to bring an ERISA claim where the plaintiff alleges a causal connection between defendants' actions and actual harm to an ERISA Plan in which the plaintiff participates. See *LaRue v. DeWolff, Boberg & Associates, Inc*., 552 U.S. 248 , 256 , 128 S. Ct. 1020 , 169 L. Ed. 2d 847 (2008) (recognizing that § 1132(a)(2) "does not provide a remedy for individual injuries distinct from plan injuries").

81. It is critical to remember that ERISA's plain text establishes a clear rule that in the course of discharging their duties, fiduciaries may never subordinate the economic interests of the plan [participants and beneficiaries] to unrelated objectives like revenue sharing or collateral, non-pecuniary matters.

82. A plaintiff may seek relief under ERISA "that sweeps beyond his own injury." Plaintiffs, as class representatives, were affected by the (1) same advisor alienating assets of the trust; (2) the same plan documents (i.e., Investment Policy Statement (IPS), adoption agreement, trust agreement, funding policy, investment monitoring reports, etc.); (3) the same imprudent fiduciary decision-making and all

the participants'/beneficiaries' accounts have been harmed similarly in this case. They have a beneficial interest in the same trust. The trust serves as the legal owner for assets sold and bought as well as the cash assets removed and paid to an unnecessary and excessively compensated provider (Greenleaf Advisors LLC/OneDigital). This was done repeatedly under Schenker's written authorization by way of (1) Greenleaf Advisors LLC flawed services agreement and (2) the recordkeeper and custodial documents executed by Schenker and their delegates and plan fiduciaries.

83.    Trust assets or corpus were removed from every one of the participants'/beneficiaries' accounts (based on Schenker's certified statements to the IRS/DOL) and alienated to Greenleaf (conflicted advisor hired by Schenker, Inc.; in violation of the plan's "Anti-Alienation" section (violation of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D): the duty to act in accordance with the documents and instruments governing the plan.)).

84.    The anti-inurement or "exclusive benefit" policy of ERISA § 403(c) is intended to protect participants' financial expectations by precluding trustees/employers from diverting funds. See Maez v. Mountain States Tel. & Tel., Inc., 54 F.3d 1488, 1506 (10th Cir. 1995).

85.    *Resolution Trust Corp. v. Fin. Inst. Ret. Fund*, 71 F.3d 1553, 1557 (10th Cir. 1995) (citing Aldridge v. Lily-Tulip, Inc. Salary Ret. Plan Benefits Comm., 953 F.2d 587, 592 n.6 (11th Cir. 1992) states: "the exclusive benefit rule can be violated only if there has been a removal of plan assets for the benefit of the plan sponsor or anyone other than the plan participants."

86.    Claims under ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2), are brought in a representative capacity on behalf of the Plan. As explained in detail below, the Plan suffered millions of dollars in losses traceable to the Defendants' fiduciary breaches and remained exposed to harm and continued

future losses. Those injuries may be redressed by a judgment of this court in favor of the Plaintiffs.

87.    Each of the Plaintiffs also has constitutional standing under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) because each Plaintiff personally suffered concrete and particularized injuries in many ways, including but not limited to the following:

- The named Plaintiffs and all Plan participants suffered financial harm as a result of the imprudent or excessive fee options in the Plan because Plan Fiduciaries' inclusion of those options deprived participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plan if Plan Fiduciaries had satisfied their fiduciary obligations. All participants continue to be harmed by the ongoing inclusion of these imprudent and excessive cost options and payment of excessive covered service providers' fees.
- The named Plaintiffs and all participants in the Plans were financially harmed by the improper inclusion of imprudent and excessively high-fee investment products in the Plan.
- The named Plaintiffs and all participants in the Plans were financially harmed by illicit kickbacks and plan-wide flawed processes and reckless decision-making when the Defendants selected/retained imprudent investment options.
- The named Plaintiffs and all participants in the Plans were financially harmed by Plan Fiduciaries' affirmative misrepresentations that their investments were secure, that Defendants were competent to provide services to them and the Plan, and that participants were not being unreasonably and unnecessarily charged for fees.

88.    Schenker, Inc. 401(k) Savings and Investment Plan allows each of the Plaintiffs and class to change their investments every business day. Historical non-private, quarterly "allocation reporting" grand totals pages (financial statements; not provided by Defendants upon written request) would help discern precisely where participants'/beneficiaries' accounts were "allocated" in prior years (what specific investments they held over specific time periods).

89.    Participants/beneficiaries can also allocate their "old" and "new money" (new biweekly salary contributions) to different mutual funds. That means (1) old

balances and/or (2) current savings' elections of investments can be changed daily and own different investments over the Class Period. Plaintiffs assert that at some point in the limitations period, they had invested in one or more of the investments that paid hidden, unreasonable, and unnecessary portfolio manager's compensation or revenue sharing. Plan Fiduciaries were responsible for costly mutual funds laden with "return-reducing portfolio manager's compensation" that never had a chance of "enhancing returns" and thus rendered them imprudent investments.

90.     Each of the Plaintiffs and participants lost significant retirement savings through their limited set of investments offered via these common breaching fiduciaries' imprudent fund selections/retentions. None of which would have been incurred had Defendants discharged their fiduciary duties to the Plan. Thus, the Plaintiffs have Article III standing to bring these claims.

91.     Section 227 of the Restatement 3rd of Trusts (Prudent Investor Rule), comment h, page 30, echoes the facts and circumstances here. Plaintiffs assert, based on specifics certified by Schenker, that it is certainly plausible Defendants' conduct was thoughtless and negligent. Their combined flawed selection and monitoring processes charged the trust and participants'/beneficiaries' accounts daily for unnecessary and detrimental "portfolio manager" compensation.

**SCHENKER PREDOMINANTLY CHOSE TRUST INVESTMENTS THAT HAD TWO EXTRA CHARGES (NOT PART OF A RESPECTIVE FUND'S BENCHMARKS)**

92.     Part of the reason for Schenker and its de facto fiduciaries (the "Defendants") failed miserably in their duties of care and loyalty was simply they deviated 180 degrees from the Prudent Investor Rule (Restatement Third).

93.     The Defendants' selections and retentions had difficulty beating their "appropriate broad-based securities market index" because all of the Defendants' choices of funds, but one, in the first year of the limitations period imposed extra material  charges to participants'/beneficiaries' accounts daily called:

1               (1) portfolio manager's compensation

2               (2) trading or transaction costs

3      94.     This information formed the basis for why Section 227 of the Prudent

4  Investor Rule (Restatement Third) was written.

5      95.     The use of portfolio managers is sometimes referred to under the

6  Prudent Investor Rule (Restatement Third) as "active strategies." These humans are

7  paid to manage a mutual fund (and all its underlying share classes) for a percentage

8  fee based on assets at the time of taking the fee (daily at 4pm).

9      96.     However, this complaint is not asserting passive is better than active.

10  Active funds are not precluded under the Prudent Investor Rule (Restatement Third).

11      97.     This complaint is about apparent flawed selections/retentions by

12  Schenker over a decade based on their Forms 5500 and the facts and circumstances

13  prevailing during selection or during monitoring periods.

14      98.     Section 227 of the Restatement 3rd of Trusts (Prudent Investor Rule),

15  comment h, page 30 states [emphasis added]:

16            Active strategies…<u>entail investigation and analysis expenses</u> and tend to
<u>increase general transaction costs</u>, including capital gains taxation.
Additional risks also may result from the difficult judgments that may
be involved and from the possible acceptance of a relatively high degree
of diversifiable risk. <u>These considerations are relevant to the trustee
initially in deciding whether, to what extent, and in what manner to
undertake an active investment strategy</u> and then in the process of
implementing any such decisions. If the <u>extra costs and risks of an
investment program are substantial</u>, these added costs and risks must be
<u>justified by realistically evaluated return expectations</u>.

**SCHENKER REGULARLY CHOSE INVESTMENTS WITH LESSER
YIELDS WHEN OTHER IDENTICAL FUNDS WERE AVAILABLE AT THE
TIME OF THEIR CONDUCT**

99.    Defendants ignored higher dividend/interest-yielding investments repeatedly. John P. Freeman, "The Mutual Fund Distribution Expense Mess," 6/28/2007, The Journal of Corporation Law, states: "Trust investment law in the prior Restatements was founded on the classic dictum of Harvard College v. Amory, admonishing trustees in general and flexible terms "to observe how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation, but in regard to the permanent disposition of their  funds, considering the probable income, as well as the probable safety of the capital to be invested." Restatement Second of Trusts ("Restatement Second") section 227.

100.    Thus, trustees are: "to make such investments and only such investments as a prudent man would make of his own property having in view the preservation of the estate and the amount and regularity of the income to be derived." Language similar to that of Restatement Second is now found in statutes and judicial opinions in most American jurisdictions."

101.    Plaintiffs are filing under ERISA Section 502(a)(2) (incorporating § 409(a)), which states that fiduciaries who are found liable for a breach of their fiduciary duties must make good to the plan for any losses resulting from that breach. 29 U.S.C. §§ 1109(a), 1132(a)(2). Therefore, although the Secretary of Labor, participants, beneficiaries and fiduciaries all have standing to bring a civil action against an ERISA fiduciary, any resulting awards are paid to the plan as a whole, rather than to the party who brings the suit.

## DAMAGES

102.    A cardinal rule is that uncertainties in fixing damages must be resolved against the breaching fiduciary. That rule long predates ERISA and, for that matter, the founding of the United States of America.

103.    To restate for emphasis, but for the Defendants' irresponsible and imprudent investment strategy that "involves extra management, tax, and transaction costs or a departure from an efficiently diversified portfolio," the Defendants'

"strategy should be justifiable in terms of…a realistically evaluated prospect of enhanced return [from the strategy]. (Edward C. Halbach, Jr., the Reporter for the Restatement and Walter Perry Johnson, professor of law emeritus at the University of California law school, in "Trust Investment Law in the Third Restatement," Real Property, Probate and Trust Journal, Volume 27, Fall 1992, pages 407-65; see Section 227 of the Restatement 3rd of Trusts (Prudent Investor Rule), comment f, page 25).

104.   Portfolio managers incur transaction costs for buying and selling stocks. Because they sell 100% of their previously purchased stocks every 1 to 1.5 years, in the aggregate, these managers' sell/buy orders delete the value of the investors' accounts. Transaction costs result from the purchase and sale of investments such as stocks and bonds by mutual fund managers. These costs are not included in a fund's expense ratio and are often hidden from participants.

## FUND MANAGERS' TRANSACTION COSTS DEFINED

105.   The Defendants selected mostly funds or investments that paid professional portfolio managers healthy compensation that was taken daily at 4pm, not to mention a smaller portion of daily deductions for revenue sharing. Equal to the portfolio manager's salary, these managers charged investors when they traded stocks and bonds. These buys and sells create similar costs to the 0.5%/yr to 1% per year fee for portfolio manager's compensation.

106.   The Securities and Exchange Commission has identified four major types of transaction costs that fund managers incur: (1) Commissions: Charges that a broker collects to act as an agent for a customer in the process of executing and clearing a trade. (2) Spread Costs: Costs incurred when a fund buys a security from a dealer at the "asked" price (slightly above current value) or sells a security to a dealer at the "bid" price (slightly below market value). The difference between the bid price and the asked price is known as the "spread." (3) Market Impact Costs: Costs incurred when the price of a security change as a result of the managers' effort

to purchase or sell the security. (4) Opportunity Costs: costs related to managers' missed or incomplete trades.

107.   Of these four types of transaction costs, only commissions are directly measured and disclosed by investment funds subject to the Investment Company Act of 1940. The remaining three costs are difficult to measure and remain undisclosed to investors and participants/beneficiaries.

| | Commissions | Spread Costs | Market Impact/ Opportunity Costs | Total |
|---|---|---|---|---|
| SEC[vi] | 0.30% | 0.45% | 0.18-1% | 0.93-1.75% |
| Elkins McSherry /Plexus /Abel Noser[vii] | 0.15% | | 1.05% | 1.20% |
| Karceski/Livingston[viii] | 0.15% | 0.24% | | |
| Sharkansky | | | | 1.24% |

vi http://www.sec.gov/rules/concept/33-8349.htm;
vii http://www.iaim.ie/files/Best_Execution_3.pdf;
viii www.zeroalphagroup.com/news/Execution_CostsPaper_Nov_15_2004.pdf

## THE MAGNITUDE OF THE DEFENDANTS' FAILURES TO MONITOR WELLS FARGO GROWTH ADM

108.   Plaintiffs demonstrate mutual fund facts buttressing their allegations and concerns over the Defendants' derelict monitoring processes. Plaintiffs' demonstration uses the Defendants' largest chosen/retained fund with portfolio managers' compensation (listed on the Defendants' certified 2017 Form 5500)—the Wells Fargo Growth Adm.

109.   Using prospectus data as of the time of the Defendants' monitoring in the 2017 plan year, the Defendants' retained choice for the Large Growth category, for participants to choose from, is listed as row 1.

110.   The Defendants committed two grievous errors here like many other funds observed by Plaintiffs--but in the interest of simplicity and brevity, their similar harmful assertions are being withheld for the moment. First, the Defendants opted for the more expensive share class ("Admin") over two cheaper identical

1  versions using the same manager and holding the exact same 96 stocks (column 2).

2  The Defendants held this same fund since 2011 so monitoring failures had occurred

3  for many plan years.

4      111.  Second, since the managers could not beat their benchmarks, the

5  Defendants' selection and monitoring processes should have removed this fund from

6  consideration initially or removed this fund (and its managers (i.e., all share classes))

7  shortly afterward. Putting $20M of trust dollars and demanding the participants'

8  menu hold this core Large Cap Growth holding exposed participants to risks and

9  underperformance. The Defendants' initial selection and, later, related monitoring

10  periods of this same manager failed miserably.

11      112.  The Defendants should have known their Large Cap Growth fund held

12  this low number versus its appropriate broad-based securities market indexes

13  because the portfolio managers had decreased the number since being added at 117

14  stocks at the time of selection. This concentration of the investors' cash is the reason

15  for the "Risk Rating" being an "E" (worst). Risk-adjusted rating conveyed to the

16  Defendants that this manager took more "risk cost" than the potential "reward

17  benefit."

18      113.  Third, short-term performance and a lack of long-term performance

19  could have been a flashing warning light during monitoring periods. A fiduciary can

20  be found to have breached the duty to investigate upon a showing that "adequate

21  investigation would have revealed that the investment at issue was improvident."

22  *Rinehart v. Lehman Bros. Holding Inc.*, 817 F.3d 56, 67-68 (2d Cir. 2016) (quoting

23  *In re Citigroup ERISA Litigation*, 662 F.3d 128, 138 (2d Cir. 2011)).

24

25  **Figure 1, data reported from www.sec.gov in 2017**

| | Top-10 Holdings Percent | Number of Holdings | *Notes | Name | Expense Ratio | Return Rating | Risk Rating | Risk Adjusted Rating | Category | 3-Year Total | 5-Year Total | 20-Year Total | Allocation US Stocks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 36.36 | 96 | Defs' choice | Wells Fargo Growth Admin | 0.960 | C | E | D | Large Growth | 34.85 | 74.20 | | 93.74 |
| 2 | 36.36 | 96 | Identical, cheaper | Wells Fargo Growth Inst | 0.750 | C | E | D | Large Growth | 35.69 | 76.08 | | 93.74 |
| 3 | 36.36 | 96 | Identical, cheaper | Wells Fargo Growth R6 | 0.700 | | | | Large Growth | | | | 93.74 |
| 4 | 0.00 | 550 | Meaningful bmk | Russell 1000 Growth TR USD | | A | C | A | Index | 43.11 | 103.42 | 255.02 | 98.79 |
| 5 | | 1,506 | Meaningful bmk | S&P 1500 TR | | B | B | A | Index | 36.58 | 95.00 | 309.26 | 97.78 |
| 6 | 0.00 | 331 | Meaningful bmk | S&P 500 Growth TR USD | | A | C | A | Index | 41.40 | 101.14 | 299.45 | 98.63 |

CLASS ACTION COMPLAINT

114.   Fast forward to November of 2022, facts and related harm caused to the Plan and Trust by Schenker, Inc. and its de facto fiduciaries. A simple calculation can precisely pinpoint the trust's missed opportunity costs over the past five years. The harm caused by Defendants' actions for selecting and keeping Wells Fargo Growth Adm (now renamed "Allspring Growth Admin") is clear looking at the past 3-Year Total for the Defendants' choice of 8.76% while the respective meaningful benchmarks earned over four times that amount.

**Figure 2, data reported from www.sec.gov in 2022**

| | Name | 3-Year Average | 3-Year Total | 5-Year Average | 5-Year Total | 10-Year Average | 10-Year Total |
|---|---|---|---|---|---|---|---|
| 1 | Allspring Growth Admin | 2.84 | 8.76 | 8.38 | 49.54 | 11.01 | 184.20 |
| 2 | Russell 1000 Growth TR USD | 11.79 | 39.70 | 12.92 | 83.59 | 15.01 | 304.91 |
| 3 | S&P 1500 TR | 10.83 | 36.14 | 10.68 | 66.09 | 13.19 | 245.21 |
| 4 | S&P 500 Growth TR USD | 11.49 | 38.58 | 12.17 | 77.58 | 14.48 | 286.63 |

## DEFENDANTS' FAILURES TO ACT TO REMOVE THE TRUST'S LARGEST FUND CAUSED $6.83M IN TRUST LOSSES (WITHOUT ADDING EMPLOYEE/EMPLOYER CONTRIBUTIONS)

115.   Figure 3 below lists the Wells Fargo Growth Adm (now called "Allspring") assets held in the trust's name five years ago and multiplies the assets by the respective returns in Figure 2. The math in Figure 3 shows that the trust is missing almost seven million dollars (because of the Defendants' careless and disloyal actions). It would be significantly more harm if the contributions from the workers and Schenker were considered.

116.   A thorough investigation requires "a reasoned decision-making process." Equivalent calculations of harm for only one investor with $10,000 saved into this fund, the largest with portfolio manager's compensation in 2017, resulted in a missing amount of 3,405 dollars (without considering contributions). Math like this

explains why Albert Einstein said, "The most powerful force in the Universe is compound interest."

**Figure 3, lost opportunity costs for 2018, 2019, 2020, 2021, 11/2022**

| Fund | Amount 2017 | 5 yr total | Earnings |
|---|---|---|---|
| Allspring Growth Admin | 20,063,462 | 49.54% | 9,939,439.07 |
| Russell 1000 Growth | 20,063,462 | 83.59% | 16,771,047.89 |
|  |  |  | (6,831,608.81) |

117.  Plaintiffs question the Defendants' "thoroughness" of their investigation into the merits of the Wells Fargo Growth Adm *initial* purchase for the trust. Plaintiffs also question why nothing was done since the Defendants' actions to add the Wells Fargo Growth Adm over a decade ago (in 2011).

118.  "Courts "focus not only on the merits of the transaction, but also on the thoroughness of the investigation into the merits of the transaction." *Tibble v. Edison Int'l (Tibble III)*, 843 F.3d 1187 (9th Cir. 2016) (en banc) (quoting *Howard v. Shay*, 100 F.3d 1484 , 1488 (9th Cir. 1996)).

119.  The prudence analysis focuses on the "fiduciary's conduct in arriving at an investment decision, not on its results." Id. A thorough investigation requires "a reasoned decision-making process." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346 , 356 (4th Cir. 2014) (internal quotations omitted).

120.  Restatement 3d of Trusts, § 90 (2012) directs when devising and implementing strategies for the investment and management of trust assets, responsible plan fiduciaries had and have a duty to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs."

121.  The Defendants repeatedly failed to act "solely and exclusively" for the benefit of participants by selecting and retaining investments in the Plan not because they merited inclusion (after a thorough investigation) but because they would generate more revenue the Defendants could direct toward the covered service

1  providers. Therefore Defendants would not receive an invoice (or a significantly
2  reduced one) for their services.

3      122.   Schenker may rely on experts like Greenleaf to assist with investigation
4  and evaluation, but Schenker must ultimately rely on their own independent
5  judgments. Bussian II, 223 F.3d at 300-01 (*Bussian v. RJR Nabisco, Inc.*, 223 F.3d
6  286 (2000)).

7      123.   In *Whitfield v. Cohen*, the trustee's failure to monitor the investment
8  manager's ongoing behavior once retained was imprudent. (682 F. Supp. 188, 195
9  (S.D.N.Y. 1988).

10     124.   Equity will not permit the loyalty rule to be circumvented by any
11 subterfuge. Indirect disloyalty is just as objectionable as direct. Hence the trustee
12 cannot avoid the operation of the doctrine by dealing with a person who is in
13 collusion with him (a straw man); or with one who has an identity of economic
14 interest, for example, a wife; or with a corporation in which the trustee owns all or
15 nearly all of the stock.

16                    **DEFENDANTS' FIDUCIARY OBLIGATIONS**

17     125.   ERISA and common law of trusts impose strict fiduciary duties of
18 loyalty and prudence upon Defendants as Plan fiduciaries. 29 U.S.C. §1104(a)(1)(A)
19 requires a plan fiduciary to "discharge his duties with respect to a plan solely in the
20 interest of the participants and beneficiaries" for the "exclusive purpose of (i)
21 providing benefits to participants and their beneficiaries; and (ii) defraying
22 reasonable expenses of administering the plan."

23     126.   29 U.S.C. §1104(a)(1)(B) and common law requires a plan fiduciary to
24 discharge her obligations "with the care, skill, prudence, and diligence under the
25 circumstances then prevailing that a prudent man acting in a like capacity and
26 familiar with such matters would use in the conduct of an enterprise of like character
27 and with like aims."

28

127.   ERISA and common law further impose an independent obligation upon Defendants as Plan fiduciaries to diversify the Plan's investment options.  U.S. Code §1104(a)(1)(C) requires a plan fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries… by diversifying the investments of the plan so as to minimize the risk of large losses…"

128.   A fiduciary's duties include a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

129.   29 U.S.C. §1132(a)(2) and common law authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109.

130.   Section 1109(a) and common law provide "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach."

131.   "One appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust." Restatement (Second) of Trusts § 205(c) (1959); see *Eaves v. Penn*, 587 F.2d at 463.

132.   The Defendants' 401(k) plan may be disqualified from favorable tax treatment for operational failures, which occur if a plan fails to operate in accordance with statutory requirements or if it fails to follow the terms of the plan document.  26 U.S.C.A. §§ 401(a), 501(a). The Defendants have the burden of proof when challenging the Commissioner of Internal Revenue's determination that a defined contribution plan is disqualified from favorable tax treatment.   26 U.S.C.A. §§ 401(a), 501(a).

133.   The Defendants' repeated depletion of trust assets' prices was derelict and misguided. Defendants caused a daily reduction of the trust's mutual funds' price (daily gross asset values (GAVs)) by wasteful expenses like portfolio

manager's compensation, SEC Rule 12b-1 fees, sub-transfer agency fees, shareholder servicing fees, finder's (incentive) fees or other types of fees. The amount of deductions for these excessive and unnecessary costs vary and while all of the deemed revenue sharing portions was taken from the trust daily, it was allowed (by the Defendants) without assurance that it would ever, completely, come back to the beneficial interest of participants/beneficiaries.

134.   This fact can be confirmed for every fund by prospectus and it resulted in reduced net asset values (NAVs), which the record keeper allocated each evening to participants. Also, the recordkeeper sold mutual funds quarterly to wire excessive compensation to covered service providers (CSP) like Greenleaf (at the Defendants' written approval). These repeated actions shows repeated negligence of tax laws and raise questions beyond the trust's losses as to whether they were even "qualified" to serve as fiduciaries. Their own plan's "birth certificate" or IRS Determination Letter states that tax-exemption "…will depend on its effect in operation…1.401-1(b)(3))."

> Your plan's continued qualification in its present form will depend on its effect in operation (Income Tax Regulations Section 1.401-1(b)(3)). We may review the status of the plan in operation periodically.

**IMPACT OF EXCESSIVE FEES ON THE TRUST**

135.   In a defined contribution plan, participants' retirement benefits are limited to the value of their own individual accounts, which is determined solely by employee and employer contributions plus the amount gained through investment in the options made available in the plan less expenses. See 29 U.S.C. §1002(34). Typically, plan participants direct the investment of their accounts, choosing from the lineup of plan investment options chosen by the plan sponsor.

136.   Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers, poor investment performance and excessive fees can dramatically reduce the amount of benefits available when the participant is ready to retire. Over time, even small differences in

fees and performance compound and can result in vast differences in the amount of savings available at retirement. As the Supreme Court explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. at 1825. Thus, violations and damages continue over time.

137. The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).[1]

138. "As a simple example, if a beneficiary invested $10,000, the investment grew at a rate of 7% a year for 40 years, and the fund charged 1% in fees each year, at the end of the 40-year period the beneficiary's investment would be worth $100,175. If the fees were raised to 1.18%, or 1.4%, the value of the investment at the end of the 40-year period would decrease to $93,142 and $85,198, respectively. Beneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees but also "lost investment opportunity"; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time. A trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical— other than their lower cost—to products the trustee has already selected." *Tibble v. Edison International* (9th Cir. 2016) 843 F.3d 1187, 1198.

139. Schenker had the tremendous bargaining power to demand low-cost recordkeeper services and well-performing, low-cost investments. All the disputed funds' SEC-prospectuses at www.sec.gov/edgar waived "initial purchase minimums for omnibus trusts/QRPs."

---

[1] https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resourcecenter/publications/401kFeesEmployee.pdf

CLASS ACTION COMPLAINT

## DOCUMENTS PLAINTIFFS RELIED UPON FOR THE COMPLAINT'S ALLEGATIONS

140.   Each year since the formation of the plan/trust on August, 1986, the Defendants' Annual Returns/Reports of Employee Benefit Plan to the U.S. Departments of Treasury and Labor ("Forms 5500" which are "Open to Public Inspection" and downloaded from www.efast.dol.gov) indicated on page 2 that their Plan and Trust's "Funding Arrangement" line 9a(3) was "Trust" and the Plan and Trust's "Benefit Arrangement" line 9b(3) was also via a "Trust."

141.   This trust funding/benefit is echoed by (1) line 9 on page 2 of every one of the Defendants' Forms 5500 reports and (2) Justice Sotomayer's comments in *Thole v. US Bank* (2020) 140 S.Ct. 1615, 1625:

> ERISA expressly required the creation of a trust in which petitioners are the beneficiaries: "[A]ll assets" of the plan "shall be held in trust" for petitioners' "exclusive" benefit. 29 U. S. C. §§1103(a), (c)(1); see also §1104(a)(1). These requirements exist regardless whether the employer establishes a defined-benefit or defined-contribution plan.  §1101(a). Similarly, the Plan Document governing petitioners' defined-benefit plan states that, at "'all times,'" all plan  assets "'shall'" be in a "'trust fund'" managed for the participants' and beneficiaries' "'exclusive benefit.'"  App. 60– 61. ***This arrangement confers on the "participants [and] beneficiaries" of a defined-benefit plan an equitable stake, or a "common interest," in "the financial integrity of the plan."  *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U. S. 134, 142, n. 9 (1985).

### FACTUAL ALLEGATIONS

142.   The Defendants' governmental reporting proves they selected/retained the following investments (open-end mutual funds and separate accounts) that Plaintiffs allege were both disloyally and imprudently selected. Moreover, the Defendants kept mutual funds with collateral, non-pecuniary benefits the Defendants benefitted from over and over since at least January 1, 2009.

143.   Similar to the "/" (slash) between the words "Return" and "Report" in the Treasury and Labor Form 5500 title "Annual Return/Report of Employee Benefit

1  Plan" a slash is used in this complaint by Plaintiffs to note that there is a connection

2  between the two words such as the phrase "selected/retained."

3      144.   Plaintiffs find both Schenker (plan sponsor and named fiduciary) and its

4  delegates (the board, the committees, the staff, etc., as well as Greenleaf based on

5  Schenker's returns/reports obtained from www.efast.dol.gov), the "Defendants"

6  violated their "duty of prudence * * *  to avoid incurring unnecessary expenses,

7  broadly defined, when administering a trust." Discussed in more detail later, the

8  Restatement (Third) of Trusts devoted considerable attention to this duty, clarifying

9  and emphasizing that "cost-conscious management is fundamental to prudence in the

10 investment function." (RESTATEMENT (THIRD) OF TRUSTS § 90 cmt. b. See

11 also RESTATEMENT (THIRD) OF TRUSTS, PRUDENT INVESTOR RULE §

12 227(c)(3) (AM. LAW INST. 1992) ("[T]he trustee must incur only costs that are

13 reasonable in amount and appropriate to the investment responsibilities of the

14 trusteeship.").

15     145.   Defendants acted imprudently and failed to act by predominantly

16 selecting/retaining funds with wasteful and unnecessary portfolio manager's

17 compensation that caused additional trading and transaction costs. Based on the facts

18 and circumstances, the Defendants' investment management processes were

19 thoughtless and not "justified by a cost-benefit analysis that incorporates risks and

20 the entire portfolio unless they realistically can be expected to produce returns in

21 excess of their necessarily higher fees or provide a diversification benefit not

22 otherwise available." (RESTATEMENT (THIRD) OF TRUSTS pt. 6, ch. 17, topic 3

23 intro. note; see also RESTATEMENT (THIRD) OF TRUSTS§ 227 cmt. h

24 (explaining how any choice to engage in active management must be justified by a

25 cost-benefit analysis that incorporates risks and the entire portfolio) unless they

26 realistically can be expected to produce returns in excess of their necessarily higher

27 fees or provide a diversification benefit not otherwise available).

28

146.   The mutual fund's "return-reducing portfolio manager's compensation" significantly reduces fund net asset values (NAVs) or prices each day and these costs affect all future returns to the trust investment (from reduced recurring dividends/interest). These reductions to the values of the trust's assets were unnecessary and these deductions against asset prices all began when the Defendants initially selected each mutual fund (to be added to the participants'/beneficiaries' limited fund menu). The only way to know if, and when, any paying participant was credited some or all of their deductions is to obtain what the Plaintiffs requested—a non-HIPAA, non-personal financial reporting from the Defendants for any quarter (at the trust level).

147.   From the www.SEC.gov site: "Management fees are fees that are paid out of fund assets to the fund's investment adviser (or its affiliates) for managing the fund's investment portfolio." Without the revenue sharing information that was denied weeks ago, and due to the fact revenue sharing is typically only one-third or less of the percent attributable to the portfolio manager's compensation, Plaintiffs are ignoring fund fees like sub-transfer agency and 12b-1 expenses in assertions of damages. Schenker failed to disclose each mutual fund's "selling agreements" ERISA budget account's cash flows receipts and distributions. Defendants often respond to complaints like this one that fund expenses such as (1) SEC Rule 12b-1 fees and (2) sub-transfer agency fees were and are being used to benefit the participants'/beneficiaries' accounts. The opacity of "revenue sharing money flows" can by paying covered service providers' required contracted compensation is much less transparent that directly billing each Plan participant via a quarterly fee amount that has a related transaction description that participants can see on their website and each quarterly statement.

148.   Irina Stefanescu, Board of Governors of the Federal Reserve System, Veronika K. Pool (Vanderbilt University), and Clemens Sialm (University of Texas at Austin and NBER) stated in "Mutual Fund Revenue Sharing in 401(k) Plans" on

January 31, 2022 reporting that revenue sharing is not credited back precisely to the participant who is the "payor" invested in the revenue sharing class of a fund. Also [emphasis added]:

> Some mutual fund families do not share revenues with the recordkeeper. The fact that some funds revenue share and some do not within the same plan raises the concern that plan expenses are not fairly distributed across participants. For instance, less sophisticated participants, who are more likely to invest in more expensive funds, may be cross-subsidizing more sophisticated participants.

149.    The tax-exempt status granted to all 401k plans is predicated on the fact that the Defendants will not protect "highly compensated employees" or have discriminatory processes against non-highly compensated or rank and file employees. Plaintiffs were denied access to governing plan documents relating to potential discriminatory practices by the Defendants.

150.    Each SEC-prospectus at www.sec.gov/edgar for the Defendants' chosen and retained funds listed on their Forms 5500 states the fund families receive omnibus trust buy and sell orders and thus, they know not for whom these transactions apply. They trade omnibus and receive no participant-level information, only trust level, and that explains why this plan's recordkeeper cannot precisely credit back any revenue sharing from the RIC (registered investment company) that operates a particular fund in the Schenker, Inc. 401(k) Savings and Investment Plan.

151.    All recordkeepers' service agreements state they attempt to allocate revenue sharing back to each affected participant within three to six-months after deductions for the portion they deserve, but if a worker has been terminated or separated, the recordkeeper can not allocate. They also can only allocate based on new money (where biweekly salary savings in the future go)—not based on the fund where the daily revenue sharing expenses were initially taken. These facts combined with a lack of uniformity, caused this plan's revenue sharing retention and

distribution to be discriminatory against non-highly compensated workers. Some mutual funds like Vanguard do not take money from their funds' investors for revenue sharing and others take 10% to 20% of the investors' expected annual rates of return (fifty basis points (twenty-five basis points for sub-transfer agency and the same for 12b-1 fees) on an average annual expected return of 5% per annum.

152.   Portfolio manager compensation (and transaction activities) costs investors daily and dearly because the expected future real (inflation-adjusted) average return of stocks ranges from three to five percent per year (3% to 5%/year) per Warren Buffett ("GDP of 3% plus dividends" (if any)).

153.   Jacobsen's Global Financial Data Index (wharton.upenn.edu) reported that stocks earned 5.01%/year from 1999 and only 1.44% per year since stocks' annual returns were first tracked in 1693.

> It's common knowledge that stocks return an average of 6% a year (at least going back to 1900).   However, Elroy Dimson, Paul Marsh and Mike Staunton from the London Business School recently revealed that when you remove dividends, stocks' gains drop to a mere 1.7% a year. Even lower than Treasury bonds over the same period.

http://www.zerohedge.com/article/take-out-dividends-and-stocks-return-less-treasuries%E2%80%A6-1900

## EVERY ANNUAL RETURN/REPORT OF EMPLOYEE BENEFIT PLAN (FORM 5500) INDICATES BROKEN FUND AND PROVIDER SELECTION AND RETENTION PROCESSES

154.   There is a huge (1) variance in compensation (some charge 1% or 20% of expected returns and some charge 0.4%) and (2) also in receipt of credits from funds like in this Plan and Trust. The credit for revenue sharing is not uniform and it can be discriminatory against non-highly compensated and less sophisticated Plan participants. Nonetheless, the Defendants will argue it is not a per se ERISA

1   violation if appropriately used to offset necessary recordkeeping costs. Proof of this
2   fact only exists in the books and records kept by Schenker (and never shared with
3   Plaintiffs upon their written requests).

4       155.   The Department of Labor has explicitly stated that employers are held
5   to a "high standard of care and diligence" and must, among other duties, both
6   "establish a prudent process for selecting investment options and service providers"
7   and "monitor investment options and service providers once selected to see that they
8   continue to be appropriate choices." See "A Look at 401(k) Plan Fees," infra, at n.3;
9   see also *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (Tibble I) (reaffirming
10  the ongoing fiduciary duty to monitor a plan's investment options).

11      156.   In regards to choosing or keeping revenue sharing versions of mutual
12  funds as in this case, the Supreme Court unanimously held in the context of ERISA
13  retirement plans that such interests must be understood to refer to "financial" rather
14  than "nonpecuniary" benefits, (Fifth Third Bancorp v. Dudenhoeffer, 573 U.S. 409,
15  421 (2014) (the "benefits" to be pursued by ERISA fiduciaries as their "exclusive
16  purpose" does not include "nonpecuniary benefits") (emphasis in original) and
17  Federal appellate courts have described ERISA's fiduciary duties as "the highest
18  known to the law." ). (See, e.g., *Tibble v. Edison Int'l,* 843 F.3d 1187, 1197 (9th Cir.
19  2016)).

20      157.   ERISA Section 404(a)(1)(B) requires a plan fiduciary to act "with the
21  care, skill, prudence, and diligence under the circumstances then prevailing that a
22  prudent man acting in a like capacity and familiar with such matters would use in the
23  conduct of an enterprise of a like character and with like aims." The legislative
24  history of this section and the case law indicates that this fiduciary duty was taken
25  from the prudent person standard developed through the common law of trusts.
26  Subjective good faith is no defense; courts require procedural prudence, which
27  requires plan fiduciaries to thoroughly investigate the merit of each decision
28  affecting the plan. (See *Sweda v. University of Pa.*, 923 F.3d 320, 329, 2019 EBC

158780 (3d Cir. 2019), cert. denied, 206 L. Ed.2d 496 (2020); *Tatum*, 761 F.3d 346; *Allison v. Bank One–Denver*, 289 F.3d 1223, 27 E BC 2746 (10th Cir. 2002); *Donovan v. Cunningham*, 716 F.2d 1455, 1467, 4 EBC 2329 (5th Cir. 1983)).

158.   The Department of Labor has stated that when assembling, choosing, or modifying an investment menu for participants' investment choices, a fiduciary must evaluate the investment alternatives on the menu *based solely on pecuniary factors*, not subordinate the interests of participants to unrelated objectives, and not sacrifice investment return or take on additional investment risk to promote non-pecuniary objectives or goals. This is exactly what the Defendants in this case did—they repeatedly sought more expensive investment options when higher yielding, less costly identical share classes were available at the time of their conduct based on their own "certified under penalties of perjury" submissions during the thirteen years of 2009 to 2021 (to the U.S. Departments of Treasury and Labor).

159.   If a fiduciary makes an investment decision based on non-pecuniary factors, the fiduciary always remains subject to ERISA's general loyalty obligation and must act in a manner that is consistent with the interests of participants and beneficiaries in their retirement income or financial benefits. Plaintiffs demonstrated here precisely when and what fund was added that had revenue sharing, but that same fund's total return and yields were depleted by *more than the revenue sharing credits* the Defendants' acted to obtain. That is, the lost opportunity costs were much greater than the short-term misguided goals of the Defendants. Simple mathematical reasoning was never used by these Defendants.

**DEFENDANTS NEVER INFORMED PARTICIPANTS OF LOWER COST, HIGHER YIELDING CLASSES OF THE SAME FUNDS WERE AVAILABLE (AT THE SAME TIME, THE DEFENDANTS CHOSE MORE EXPENSIVE AND LOWER YIELDING SHARE CLASSES)**

160. Plaintiffs find that Defendants failed to inform the participants/beneficiaries of better, cheaper, higher yielding, substantially identical

investment options on their annual 29 CFR § 2550.404a-5 notices called "Fiduciary requirements for disclosure in participant-directed individual account plans." A fiduciary's duty "includes the responsibility to inform the beneficiaries fully of all facts which would aid them in protecting their interests." *Allard v. Pac. Nat'l Bank,* 99 Wash.2d 394, 404, 663 P.2d 104 (1983) (citing Esmieu, 88 Wash.2d at 498, 563 P.2d 203).

161.    Plaintiffs argue that Defendants misrepresented material facts that would induce them (a reasonable person) to ultimately invest in and rely upon the less comprehensive and misleading information.

162.    Plaintiffs argue that Defendants committed (1) failures to inform participants (on their annual fee disclosures) and the Defendants (2) purposefully hid potentially higher trust income from cheaper (available) share classes (at the time of forcing participants to invest salaries into more costly, lower yielding classes). Information about the cheaper, higher yielding share classes with identical stocks/bonds managed by the same managers caused their future contributions and reinvested dividends/interest (referred to as "probable income" under Restatement (Third) of Trusts) to be invested in identical but more costly investments. This is a material breach.

163.    A misrepresentation is only actionable if it is material. A misrepresentation is material if the statement would induce a reasonable person to rely upon it. *Ballone v. Eastman Kodak Co.*, 109 F.3d 117, 122–23 (2d Cir. 1997).

164.    Plaintiffs note *Krohn v. Huron Mem'l Hosp.*, 173 F.3d 542, 547 (6th Cir. 1999) stated that information is material "if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision in pursuing . . . benefits to which she may be entitled."

165.    As the figure below indicates, prices of mutual funds are reduced by a portfolio manager's compensation the day such a fund is added. That means the trust corpus is eroded immediately (and ultimately, the participants'/beneficiaries'

bookkeeping accounts). Open-end management investment companies' mutual fund expenses are deducted daily at 4 pm from each fund's GAV (gross asset value) price to arrive at the participants'/beneficiaries' allocated NAV (net-asset value).

**Figure 4**

| | Net-Asset Value | Name | Symbol |
|---|---|---|---|
| 1 | 19.79 | Invesco Small Cap Value A | VSCAX |
| 2 | 21.60 | Invesco Small Cap Value R6 | SMVSX |

166. Since the portfolio manager's compensation percentage amounts is identical for all share classes of a fund (per SEC-prospectus at www.sec.gov/edgar), the figure above proves that it is the revenue sharing percentage that ultimately reduces the NAV (or price of this trust's "A" Invesco fund). Revenue sharing leads to a reduction of the fund values (and trust assets) as well as the retirement wealth of participants. This revenue sharing cost (there were no revenue sharing deductions in the "R6" class) degrades the Defendants' "A" class and impedes retirement wealth for all investors in the "A" share class above. It also means the financial statement reporting to the U.S. Departments of Treasury and Labor was potentially wrong and misleading for all terminated and current workers. Estimable accrued income (EAI) is and was due harmed participants. Management failed to notify the auditors and therefore, the Forms 5500 were incorrect and misleading to Plaintiffs and the class.

167. Plaintiffs' allegations include facts that support the Defendants' reckless actions to use trust corpus to buy/retain imprudent funds laden with costly managers' expenses (detrimental to the trust and participants'/beneficiaries' accounts). Wasteful portfolio manager's compensation was taken from the trust's corpus daily for plan investments detailed here and all of the Defendants' selected funds with portfolio manager's compensation.

168. Because indirect compensation to covered service providers from revenue sharing is less transparent, these intermediaries may be able to overcharge

1   some of their customers, as discussed by Inderst and Ottaviani (2012) and Stoughton,

2   Wu, and Zechner (2011); Inderst, R. and M. Ottaviani (2012). "How (not) to pay for

3   advice: A framework for consumer protection," Journal of Financial Economics 105,

4   393–411).

5       169.   Consistent with this, a 2011 study on 401(k) plans by the Government

6   Accountability Office (GAO) suggests that due to sponsors' and participants' lack of

7   understanding of indirect fees, recordkeepers may not reduce direct fees sufficiently.

8   If direct and indirect payments do not offset each other, recordkeepers may collect

9   more revenue in the presence of indirect compensation and participants may pay

10  higher fees in these plans. Additionally, if recordkeepers are better off when they

11  receive compensation indirectly, they may influence 401(k) sponsors to include and

12  subsequently keep funds on the menu that pay a higher rebate, even when these

13  funds are dominated by peer options. Therefore revenue sharing may also impose

14  costs on participants through its effect on the menu design.

15                  **THE DUTY OF PRUDENT DELEGATION**

16      170.   Hiring an independent outside advisor is not a magic wand that satisfies

17  a fiduciary's duties to the Plan and participants.  While a fiduciary or trustee is not

18  required personally to perform all aspects of the investment function, it must not

19  abdicate its responsibilities and must not delegate unreasonably. See Restatement

20  (Third) of Trusts:

21

22          As in other matters of delegation, the trustee must not abuse the
           discretion to delegate.......  In deciding what as well as whether to
23          delegate and in selecting, instructing, and supervising or monitoring
           agents, the trustee has a duty to the beneficiaries to act as a prudent
24          investor would act under the circumstances. The trustee must exercise
           care, skill, and caution in establishing the scope and specific terms of
25          any delegation, and must keep reasonably informed in order to monitor
           the execution of investment decisions or plans.
26

27

28

171. Based on information and belief, Plaintiffs find the Defendants' chosen/retained fiduciary advisory firm Greenleaf was allowed to violate ERISA and common trust law. The U.S. Securities and Exchange Commission (SEC) Division of Enforcement warns investors (like trustees/fiduciaries at Schenker, Inc.) of behavior to select/keep identical but more expensive share classes of mutual funds. The SEC has stated many times publicly that different share classes are simply a variation of the same fund—it is just packaged with a different CUSIP and ticker. For example, the press release "SEC Launches Share Class Selection Disclosure Initiative to Encourage Self-Reporting and the Prompt Return of Funds to Investors" (https://www.sec.gov/news/press-release/2018-15) referred to [emphasis added]:

> The SEC may file enforcement actions * * * against investment advisers that fail to disclose to their clients conflicts of interest, including those conflicts associated with the receipt of 12b-1 fees for investing client funds in, or recommending that clients invest in, a 12b-1 fee paying share class when a lower-cost share class was available to clients for the same fund. A 12b-1 fee is a fee paid by a mutual fund on an ongoing basis from its assets for shareholder services, distribution, and marketing expenses. Each share class of a fund represents an interest in the same portfolio of securities. Therefore, when there is a lower-cost share class available that does not charge a 12b-1 fee (or charges a lower 12b-1 fee), it is usually in the client's best interest to invest in the lower-cost share class rather than the 12b-1 fee paying share class because the client's returns would not be reduced by the 12b-1 fees. (https://www.sec.gov/enforce/announcement/scsd-initiative)

172. Based on information and belief, Greenleaf acted in a excessively-compensated and licensed ERISA investment advisory and fiduciary manner ("agent" under fundamental principles of agency law stating that a fiduciary relationship was formed; "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement

1    (Second) of Agency, § 1(1) (1958); "An agent is a fiduciary with respect to matters

2    within the scope of his agency.").

3        173. Industry experience from Plaintiffs' experts shows that (without

4    contrary advice from other licensed firms), advice recipients will more often than not

5    accept intermediaries like Greenleaf's recommendations (since they are licensed and

6    have access to investment software) and, in effect Schenker will then direct the

7    custodian to sell the trust corpus in an older investment and move the trust's cash

8    into the Greenleaf Advisors LLC's proposed fund (changing the employees' 401k

9    menu to the fund Greenleaf has recommended).

10       174. The Defendants' chosen funds' SEC-prospectuses (at

11   www.sec.gov/edgar) state that at the time, the Defendants "seeded" or funded open-

12   end management investment companies with participants' salary dollars, incentive

13   fees or finder's fees may have been triggered to compensate Greenleaf Advisors

14   LLC and its affiliates (or the recordkeeper) with "soft-dollar" compensation (such as

15   off the books (outside of the Forms 5500 Schedules C) payments for finder's fees,

16   education, trips, awards, etc.). The only way to know for sure is to obtain the

17   respective funds' selling agreements through a limited or controlled discovery

18   process.

19       175. Plaintiffs remain subordinate and cannot access information relating to

20   many critical aspects due to the refusal of the Defendants and their representatives.

21   The general rule placing on the plaintiff the burden of proving his claim "is

22   moderated to take account of . . . the trustee's superior (often, unique) access to

23   information about the trust and its activities." (Restatement Third, § 100 cmt. F).

24       176. Also, Greenleaf's functional fiduciary status (by implicit "control" of

25   assets) can be later determined in meeting minutes and mutual fund resolutions to

26   remove/replace that Schenker executed to add to participants'/beneficiaries' menu

27   (the Defendants refused to provide this also to Plaintiffs, upon request).

28

CLASS ACTION COMPLAINT

177. Plaintiffs believe Greenleaf's pay taken from the trust to serve Schenker, Inc. 401(k) Savings and Investment Plan was excessive and unnecessary, especially compared to pay reported under Forms 5500 for all other Greenleaf clients (under a similar agreement). Greenleaf Advisors LLC helped harm the trust and participants'/beneficiaries' accounts. Pay is permitted to covered service providers necessary for the plan's operation per the Defendants' plan documents and ERISA. The table below is taken directly from the Defendants' certified annual reports to the U.S. Departments of Treasury and Labor.

178. Mr. Jochen Thewes, Chief Executive Officer, or his delegate, Mr. Oliver Seidl, Chief Financial Officer, approved almost 1.8M to be taken from the trust and paid to Greenleaf Advisors LLC below:

| Service Provider | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|---|---|---|
| Greenleaf Advisors | 256,466 | 261,203 | 285,123 | 316,394 | 322,799 | 342,419 | 1,784,404 |

## SCHENKER PAID GREENLEAF ADVISORS LLC MUCH MORE THAN OTHER 401K CLIENTS

179. Greenleaf's annual pay from every other client (using the same services agreement) was much less based on reviews of every client's reporting at www.efast.dol.gov. Greenleaf's annual over a quarter of a million-dollar compensation was deducted or alienated (wired to them from the CFO's direction/signature) from the plan's "investment sells" required to raise this much cash. These actions were done in violation of the Schenker plan document's "Nonalienation of Benefits . . ." section.

180. Plaintiffs' experts discovered that median pay to Greenleaf from every client (including Schenker, Inc.) was only $18,711 (and their median clients' assets were less than 10% of Greenleaf had only one client (BRENNTAG NORTH

AMERICA INC.) that was close in size to Schenker, Inc. 401(k) Savings and Investment Plan.

181.   Ms. Cynthia DeGalleford, Director Benefits certified that no excessive compensation was paid to Greenleaf Advisors LLC by way of her answers of "NO" to the government's question on line 4d on Schedule H (Form 5500), plan year 2016-2021 ("Were there any nonexempt transactions with any party-in-interest?").

182.   Responsible plan fiduciaries alienated trust assets (and every participants'/beneficiaries' dollars) by transferring over $1.7M to Greenleaf since 2015--even though Greenleaf's services were (1) excessively compensated; (2) detrimental to trust assets and (3) unnecessary to the operation of the plan.

183.   The Fee Benchmarker® (Advisor Fee Almanac, 6th Edition, 2017) estimates a "reasonable" payment for 100 hours of service each year under the same services agreement (same services). At the maximum "principal" rate of $300 per hour that would equal $30,000 of potentially reasonable compensation. The DOL stated *Perez v. City Nat'l Corp.*, 231 F. Supp. 3d 593, 597 (C.D. Cal. 2017) and other cases that reasonable compensation is a fact and circumstances test.

184.   Recordkeepers and advisors should determine costs to serve an ERISA client first and then add a reasonable profit—courts and the IRS and DOL require that any excess pay must be returned to the plan according to the plan documents IRS Employee Plans Compliance Resolution System (EPCRS) section to maintain tax-exempt status.

185.   The U.S. Department of Labor, the Schenker master plan document, and ERISA state that the plan sponsor/named fiduciary, Schenker, is ultimately responsible for prudently hiring covered service providers like Greenleaf. Plaintiffs noted from Greenleaf's filings at (1) SEC.gov and (2) from other services agreements that massive Plan and Trust deductions from assets were alienated to Greenleaf since at least 2015—such large distributions from the trust require a chief executive or chief financial officer's approval to execute these annual transactions.

186.   Greenleaf's public disclosures from FINRA and the U.S. Securities and Exchange Commission (SEC) filings disclosed that … Schenker was the largest…highest paying…client. Brenntag and Schenker, Inc. are statistical outliers (due to their large plan size) from Greenleaf's thirty (30) other 401k clients. Therefore, experts analyzed their median client's asset size without these two large plans to avoid skewing an analysis of Greenleaf's client data. Plaintiffs learned Greenleaf Advisors LLC's (1) average client size in 2016 was only $25M and (2) median pay was only $17,317 (far less than Schenker, Inc.'s direct trust payments from the plan to Greenleaf (for similar services offered to other clients)).

**SCHENKER PREFERRED TO IGNORE FUNDS' PORTFOLIO MANAGERS' COSTS AND LACK OF SKILL TO FOCUS ON RECEIVING POTENTIAL KICKBACKS FROM SEC-REGISTERED MUTUAL FUNDS**

187.   Plaintiffs infer a causal connection to their harm from Schenker based on publicly available sources at www.efast.dol.gov and www.sec.gov/edgar.

188.   Greenleaf Advisors LLC harmed the plan by repeatedly recommending expensive mutual funds, and the Defendants accepted their advice without investigation, thus violating ERISA § 406(b).

189.   As in this case for the funds' demonstrations, Plaintiffs show the Defendants acted to add these funds, with high annual costs for return-reducing portfolio manager's compensation " * * *  without compelling justification." (See Bryon W. Harmon, Esq. and Laura A. Fisher, Esq.; "The Prudence of Passivity: An Argument for Default Passive Management in Trust Investing," ACTEC Law Journal (The American College of Trust and Estate Counsel), Volume 44, Number 2, Spring 2019).

190.   With actively managed mutual funds, the funds' respective portfolio managers charged fees based on a percentage of the fund's total assets (total assets of all share classes ("A" shares, "R6" shares, among others). Thus, more actual dollars are paid from participants with larger salary savings and account balances (and from

biweekly salary deferral dollars) than from participants with smaller account balances.

191.   For example, based on Plaintiffs' experts, recordkeepers like Vanguard and Fidelity handle over one in every five Americans' 401k accounts. They, upon request, will price a per-participant transparent quarterly fee on everyone's statement of ten to twenty dollars per quarter ($40 - $80 per annum). Upon request, if a plan sponsor does not want their participants to see fees, Fidelity can also charge what they speciously call a flat "percentage" fee of 0.5 %/annum (one-half of one percent per year).

192.   A preponderance of the evidence proves Schenker, Inc. 401(k) Savings and Investment Plan sought indirect revenue sharing compensation (Plaintiffs asked for services agreements and contracts that affect their beneficial trust interests). Most funds with portfolio managers charge even more in order to offer revenue sharing incentives--only the 12b-1 is stated in the prospectus.

193.   The Defendants' specific chosen and retained funds (reported to the U.S. Departments of Treasury and Labor at www.efast.dol.gov) had the following mutual funds' names and share class. Each of the Defendants' chosen funds deducts the portfolio manager's compensation most deduct revenue sharing of one or more types. However, this does not mean the payor (the trust/participant) received/captured any of these dollars and does not mean participants ever received any of this indirect compensation they paid.

> Gabelli Small Cap Growth A
> Oakmark Equity And Income Investor
> Lord Abbett Total Return R3
> Causeway International Value Inv
> ClearBridge Large Cap Value I
> Invesco Small Cap Value A
> PGIM Quant Solutions Mid-Cap Val Z
> Janus Henderson Balanced T
> PGIM Jennison Mid-Cap Growth A

-52-

T. Rowe Price New Horizons
JPMorgan SMID Cap Equity R6

## DEMONSTRATING SCHENKER'S FLAWED FUND SELECTION PROCESSES

194.   The Defendants chose these funds because all had revenue sharing available (taken throughout the year from these funds' daily NAV (price; $1/365^{th}$ of an average of 0.25% to 0.5%/annum is taken at 4pm (market's close) daily via SEC Rule 12b-1 fees, sub-transfer agency fees--the amount of revenue sharing received varies from one underlying SEC-registered mutual fund to another). As a result, participants with larger contributions paid more costs from percentage-based revenue sharing. To better explain:

> Participant A was hired ten years ago and has saved 8% of pay (from $32,500 W-2 wages) or $100 biweekly during that time ($2,600); a typical Rule 12b-1 fee of 0.5%/annum is charged so her balance after ten years is $32,702.52 hence, her recordkeeping fee is $163.51 (0.5% times her balance of $32,702.52).

> Participant B has the same fact pattern with one exception—he rolls over $100,000 of old 401k money sitting at his old employer into his current Schenker 401k account—he puts fifty percent ($50k) into the fund that takes the 12b-1 fee and the other $50k into a money market without 12b-1 fees. Now his balance of $82,702.52 at 0.005, this means his annual recordkeeper fee is now $413.51 (for the same service).

195.   Plaintiffs' experts have met with many recordkeepers to confirm that recordkeepers are often asked by plan sponsors how they can keep administrative fees from showing on their participants' quarterly statements. Recordkeepers can accomplish this request using their short list of "approved" revenue sharing open-end management investment companies.

196.   "Approved" usually means the recordkeeper signed a "selling agreement" with the fund family. These are highly "sold" or recommended to plan

committees (and their chosen brokers (Series 6 or 7 licensed)) who legally "sell" SEC-registered mutual funds. (Plaintiffs were denied a copy of Schenker, Inc. related selling agreements).

197. Retirement plans are "sticky," so most fund families love 401k assets because they are seldom removed from 401k menus (funds stay forever because they are fed from biweekly salary reductions and tenure is almost 10 years). Consequently, fund families have been waiving minimum purchase amounts for years. Also, given that funds are fed by recordkeeper and broker activity, they often willingly share revenue "indirectly" (via selling agreements; pay is not reflected on participants' statements).

198. Therefore, a recordkeeper (and broker) can inform the plan's sponsor they (1) do not need to write a check and (2) participants will not become concerned about a "fee deduction of over $100" per person per year.

199. Mathematics explains the $100—the average account balance in Schenker, Inc. 401(k) Savings and Investment Plan is about $37K (see below). The average recordkeeper fee, assuming the Schenker, Inc. 401(k) Savings and Investment Plan recordkeeping firm has a strong selling agreement (meaning if twenty-five basis points are taken in 12b-1 fees (the total collected by a fund) and the same for sub-transfer agency (to convert omnibus trading at NSCC to participants' bookkeeping accounts) means that fifty basis points (which depletes one-tenth of the funds' expected rate of return) equal charging $185.79 each year.

200. This amount does not include the average contribution $3,548.62 per person per year for Schenker's workers (or $21,291.75 in total since 2016).

201. Biweekly deposits of future contributions deferred from each of their salaries generate another $106.56 per person in revenue sharing fees paid and for use by Schenker and their responsible plan fiduciaries (to direct to a provider).

202. Table 1 below:

-54-

**Table 1**

| Plan Year | Average Balance | Revenue sharing |
|---|---|---|
| 2016 | 28,373.00 | $141.87 |
| 2017 | 35,539.00 | $177.70 |
| 2018 | 30,971.00 | $154.86 |
| 2019 | 38,631.00 | $193.16 |
| 2020 | 42,174.00 | $210.87 |
| 2021 | 46,057.80 | $230.29 |
| **Average:** | **36,957.63** | **$184.79** |

203.  Now we look at Table 1 above to better understand the more realistic impact of choosing funds with revenue sharing. As participants save their wages into the trust's mutual funds, open-end management investment companies take their fees on a percentage basis. Thus, the more in the fund, the more dollars are charged.

204.  Table 1 uses actual Schenker, Inc. 401(k) Savings and Investment Plan trust growth numbers over the past five years, which can impart future trust asset growth (using the Defendants' certified financials sent to the federal government). Plaintiffs' experts found the Plan and Trust's internal rate of return/growth was almost identical to the National Average (0.16%/yr more for this Plan). Information like this was in the Defendants' hands when choosing and keeping every mutual fund reported to the U.S. Departments of Treasury and Labor since 1/1/2009.

205.  "Asset-based compensation" (versus a per-capita $10 quarterly fee ($40/yr/participant)) is problematic for ERISA plans as it would be for an attorney or accountant to charge their clients as a percentage of net worth. Per head or per capita fees are totally transparent and they are unaffected by future rollovers, employee contributions, employer contributions, reinvested interest and dividends along with every other cash flow.

206.  Moreover, forty bucks is a usual, customary and typical amount after technology cost deflation (via Amazon's large mainframe PCs shared in their cloud; $40-$50 per year is also echoed in past surveys by Deloitte, NEPC, and 401k Averages Book surveys).

207.  The Defendants will probably argue that ERISA does not state the use of revenue sharing is "per se imprudent" (when used to *properly* pay providers'

costs). That broad argument fails when doing the math for this plan (Schenker, Inc. 401(k) Savings and Investment Plan).

208.   Both the DOL regulators and courts are becoming wise about the impact of percentage-based charges (revenue sharing) on participants' salary dollars. They have ruled recently that utilizing a revenue sharing approach may not be per se imprudent, but unchecked, it can be devastating on participants' account balances. Every past and future wage dollar they will save (and the related re-investment dollars from interest/dividends) will be charged another new "percentage" fee—even though there are no additional services to the "payor" (in violation of ERISA § 408(b)(2)).

209.   The average worker tenure in the USA is 4 years (Bureau of Labor Statistics (BLS)). Here, the Schenker executives' and fiduciaries' goal of using the 401k to lure/retain workers is working. Participant tenure at Schenker runs at over two times the Bureau of Labor Statistics (BLS) level (almost ten years (9.6 yrs)).

210.   Table 2 demonstrates that under the revenue sharing scheme chosen by Defendants, only "year one savers" will pay more (19.91 bucks) over a flat $40/yr fee (versus one-half of one percent in revenue sharing). The math proves this: Table 2 below

//
//
//
//
//
//
//
//
//

**Table 2**

| Provider pd by participants' rev share | Avg. Schenker Part Contribution | Avg. Tenure ('16-'21) | Hypothetical Provider pd $40/part/yr |
|---|---|---|---|
| $20.09 | $4,018.60 | 1 | $40 |
| $42.28 | $8,456.75 | 2 | $40 |
| $66.79 | $13,358.24 | 3 | $40 |
| $93.86 | $18,771.44 | 4 | $40 |
| $123.75 | $24,749.79 | 5 | $40 |
| $156.76 | $31,352.27 | 6 | $40 |
| $193.22 | $38,644.05 | 7 | $40 |
| $233.49 | $46,697.09 | 8 | $40 |
| $277.95 | $55,590.87 | 9 | $40 |
| $327.07 | $65,413.17 | 10 | $40 |
| **$1,535.26** | | | **$400.00** |

211.   After year 1 above, revenue sharing costs of $42.28 begin to climb. After the fifth year, the $10/quarter is about one-third of the revenue sharing payment method ($123.75).

212.   Trust laws requiring avoidance of costs to a beneficiary imply it is not reasonable for Defendants to set up a pay structure that forces hundreds of their workers at the midpoint of their career (with five years of service) to pay $123.75 (fifty basis points) for a recordkeeper (and sometimes a broker) when the exact same service could received for less than two basis points ($40/$24,749.79) instead of twenty-five basis points in this case.

213.   Plaintiffs believe that if one Schenker fiduciary had asked workers many years ago a straightforward question about how they would prefer to pay their 401k provider costs (i.e., revenue sharing classes of mutual funds or a flat $10/quarter) they would have preferred the transparent $10/quarter feesince it is more fair because everyone receives the same service level.

214.   A revenue sharing payment method means longer-serving employees will experience increasing 401k costs that go up forever as their account balances increase over time. The average tenure for Participants in this Plan is ~10 years. Harm is self-evident in the table above. Plaintiffs illustrated the growth of accounts and the triggering of charging more for a ten-year tenured worker versus a five-year

-57-

1    employee. Harm occurs because it is not flat based on services—it is conditioned on

2    amounts of dollars or assets in participants' accounts.

**THE DEFENDANTS' METHOD OF PROVIDER PAYMENTS IS**
**EQUIVALENT TO A TAX ATTORNEY CHARGING CLIENTS BASED ON**
**THEIR "ADJUSTED GROSS INCOME"**

6    215.    The Defendants' preferred choice of selecting a mutual fund with

7    revenue sharing (for later direction to covered service providers) is akin to a CPA or

8    a tax attorney charging for income tax work based not on the complexity or hours

9    worked for someone's tax situation but instead based on how much gross income

10   they show on their balance sheet.

11   216.    The Defendants' chosen revenue sharing collection scheme (to avoid

12   receipt of providers' invoices) is not only mathematically harmful to long serving

13   workers but also opaque. It makes the Schenker 401k look "free" to participants. The

14   more participants save, the more revenue sharing payments they pay every day but

15   these payments do not show on their quarterly 401k statements.

16   217.    Open-end management investment companies (mutual funds) take

17   revenue sharing payments/deductions whenever:

18            (1) Participants save their salaries biweekly into a fund:

19            (2) Schenker contributes a match of the worker's deposit into a fund;

20            (3) Participants roll over their eligible IRAs or prior 401k accounts;

21            (4) Participants' investments distribute the interest to participants;

22            (5) Participants' investments distribute the dividends to participants;

23            (6) Participants' investments distribute the realized gains to participants;

24   218.    Any revenue sharing credit that may eventually make it to the

25   responsible "paying participant" is (1) missing the compounding of earnings and (2)

26   conditioned as to whether the plan's sponsor, Schenker, negotiated full revenue

27   sharing collection and eventual credit back to affected participants. Also, the typical

28   agreement of a Schenker-sized plan executed with this plan's covered service

1    providers stated that the receipt to a provider of omnibus trading from a mutual
2    funds' revenue sharing agreement is quarterly (even though it is deducted daily from
3    participants). The credit back to a worker is even another quarter or two away.

4        219.   Finally, the recordkeeper does not allocate revenue sharing of any
5    amount if an affected participant:

6        (1) changed his investments

7        (2) changed her allocation of future savings

8        (3) received a loan or hardship distribution from the asset for which the
9            revenue sharing was collected originally in prior biweekly deductions

10       (4) or the affected participant separated from service.

11       220.   It makes no sense to violate Congressional intent to encourage workers
12   to save into these tax-exempt plans if the longer a worker stays, they are forced by
13   companies to pay more money to a provider their employer chose.

14       221.   The SEC states that the 12b-1 fee is for marketing and distribution
15   reimbursement. Thus, logically, this implies the "12b-1 paying participant" eats
16   reduced earnings (from the 12b-1 fees) in order to "sell themselves" the Defendants'
17   chosen mutual funds.

18       222.   On top of that, Schenker, Inc. refused to tell Plaintiffs how and why this
19   payment preference has been repeatedly made year after year since 2009. Plaintiffs
20   must infer (since Schenker is not licensed as Series 6/7 to take the money) that their
21   repeated decisions to pay providers in this manner were to avoid costs on Schenker
22   and/or to hide the payments to their preferred and chosen provider(s).

23       223.   In essence, Schenker's selected provider is allowed to continually, daily,
24   take participants'/beneficiaries' "retirement property" by forcing nine-tenths of the
25   average tenured worker to pay much more than the 20 bucks the first-year workers
26   must pay. Harming 90% of the participants in order to protect 10% (from 20 bucks)
27   is nonsensical. Many other payment methods exist: (1) have the recordkeeper waive

28

CLASS ACTION COMPLAINT

their first year of employment fee or (2) Schenker offers a $20 one-time bonus upon hire to offset the one year flat fee cost.

224.   Most SEC-registered mutual funds came into existence when boards of directors at RICs (registered investment companies selling open-end mutual funds) convinced the SEC to allow them to charge Rule 12b-1 fees in 1980. Based on SEC discussions, this was because prior upfront loads were seen on clients' statements, and the 12b-1 or other embedded compensation remains opaque.

225.   So, portfolio managers' asset-based pay rises as investors' biweekly contributions are saved into their funds--investments' dividends and interest are reinvested (regardless of any managers' returns over their funds' meaningful benchmarks). The portfolio manager's compensation (investment management fees) is deducted daily from fund prices (and investment returns) regardless of performance--hence, dividends, capital gains, interest, etc., pay this fee, too-- without a single contributing participant's knowledge.

226.   Plaintiffs question the (1) caution, (2) care, (3) skill and (4) loyalty of Schenker in managing the Plan and Trust called Schenker, Inc. 401(k) Savings and Investment Plan. For emphasis, the Plaintiffs show one fund that exemplifies most if not all of the problems with the Defendants' selection/monitoring processes.

## THE DEFENDANTS' SMALL CAP VALUE SELECTION:
## INVESCO SMALL CAP VALUE A

227.   The SEC-prospectus data for Figure 5 below is as of 2017-09-30 and Figure 6 is as of 2022-11-30. Row 1 indicates the Defendants' selected fund's name. Minimum purchase amounts are waived for qualified retirement plans (QRP) and "omnibus trusts" to buy all share classes, including the high-minimum institutional versions.

228.   Plaintiffs infer the Defendants acted to review this investment in the Figure below during plan year 2017. With Greenleaf's help, Defendants' review processes should have discerned that Invesco Small Cap Value A had an 3-Year

Total return of 27.66%. In comparison, its identically managed and constituted sister class "Y" earned more at 28.58%--the same inferences can be drawn for five and ten years. The trust's "probable income" in the next column (Yield 12-Month) was 0.16% for the Defendants' choice versus twice that at 0.38%/year for the "Y" or "True No-Load" version. The Expense Ratio of 1.11% is exactly twenty-five basis points more than the "True No-Load" "Y" version explaining why the Plaintiffs infer disloyal selection processes given the Defendants appear to be seeking non-pecuniary or collateral factors in their decision to add/keep a fund (over economic or pecuniary factors). This failure was to the detriment of the trust and participants' accounts.

**Figure 5, 2017 prospectus data**

| Name | 3-Year Total | 5-Year Total | 10-Year Total | Yield 12-Month | Manager Name | Manager Start Date | Expense Ratio | 12b-1 Fees | True No-Load | Telephone Switch | Toll-Free Number |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1▶ Invesco SmallCapValue A | 27.66 | 96.29 | 140.01 | 0.16 | Coleman/Edwards/Mueller | 6/25/2010 | 1.110 | 0.250 | N | Y | 800 959-4246 |
| 2▶ Invesco SmallCapValue Y | 28.58 | 98.70 | 146.02 | 0.38 | Coleman/Edwards/Mueller | 6/25/2010 | 0.860 | | Y | Y | 800 959-4246 |

**Figure 6, 2022 prospectus data**

| Name | 3-Year Total | 5-Year Total | Yield 12-Month | Manager Name | Manager Start Date | Expense Ratio | 12b-1 Fees | True No-Load | Telephone Switch | Toll-Free Number | Inception Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1▶ Invesco Small Cap Value A | 69.96 | 61.78 | 0.03 | Edwards/Mueller | 6/25/2010 | 1.120 | 0.250 | N | Y | 800-959-4246 | 6/21/1999 |
| 2▶ Invesco Small Cap Value R6 | 72.02 | 65.04 | 0.24 | Edwards/Mueller | 6/25/2010 | 0.730 | | Y | Y | 800 959-4246 | 2/7/2017 |

229.    The ease of switching to cheaper share classes is remarkable. The Defendants could have rectified their imprudent prior processes easily by spending fifteen minutes (since adding this fund before 1/1/2009) to call 800-959-4246 and request a "switch" to the cheaper, identical "True No-Load" class. Nevertheless, the more costly, lower yielding Invesco Small Cap Value "A" class remained on the Defendants' 2021 audited financial statements (based on the U.S. Departments of Treasury and Labor).

230.    Either the Defendants' review processes (1) never caught the prior imprudent actions causing harm to both current and former employees for many years or (2) the Defendants did not care to improve their processes. Clearly, this is

CLASS ACTION COMPLAINT

1    evidence of a process that is "tainted by failure of effort, competence,  or loyalty."

2    *Braden v. Wal-Mart Stores*, 588 F.3d 585, 596 (8th Cir. 2009).

3        231.   Plaintiffs now focus on Figure 6 above. An even cheaper "R6" class

4    was displayed on the same prospectus page as the Defendants' earlier "A" choice (in

5    2017, 2018, 2019, 2020 and 2021 SEC prospectuses). From the Defendants' repeated

6    failures to act over many years, an inference can be made that their self-interest (i.e.,

7    in collateral, non-pecuniary factors such as revenue sharing) was more important to

8    the Defendants.

9        232.   The participants' salary savings income and appreciation (i.e., the

10   participants' pecuniary, beneficial and economic interests) must have been less

11   important to the Defendants than compliance with the Prudent Investor Rule

12   (Restatement Third) and prevailing trust and ERISA laws. Ostensibly, the

13   Defendants' continued receipt of mutual fund revenue sharing credits (instead of

14   receiving a bill or exposing these hidden costs to participants) mattered the most to

15   the Defendants--even after the R6 class' inception on 2/7/2017.

16       233.   The main principle to follow once a beneficiary establishes a trust in the

17   first place is to ensure they have a skilled and loyal steward. In this case, they could

18   not choose this steward. They (Schenker, Inc.) were selected for them. The

19   Defendants' flawed monitoring processes exist today. That is the root cause of harm.

20       234.   The Defendants' past actions tell a story for the entire Plan and Trust's

21   investment menu that was always developed and maintained by Schenker (not by

22   participants). The Schenker, Inc. 401(k) Savings and Investment Plan investment

23   processes are processes the Defendants make at a plan level using a plan-level

24   funding and investment policy. It is both illogical and unreasonable to conclude that

25   *responsible* plan fiduciaries have investment selection/retention processes (an

26   Investment Policy Statement (IPS)) for one SEC-registered mutual fund and another

27   Investment Policy Statement (IPS) for a different SEC-registered mutual fund.

28

235.    For ease of reading, the Plaintiffs reuse a figure. Interest rates have risen dramatically during the past years, which can be seen here. The Defendants also ignored the newer, cheaper, identical version "R6". But for the Defendants' reckless and disloyal processes, the participants'/beneficiaries' accounts had an opportunity to have their millions in salary dollars growing faster with the cheaper R6 class 0.24% yield (versus theirs at 0.03%). These opportunities for compounded growth were foregone due to the Defendants' actions.

**Figure 7**

| | Name | 3-Year Total | 5-Year Total | Yield 12-Month | Manager Name | Manager Start Date | Expense Ratio | 12b-1 Fees | True No-Load | Telephone Switch | Toll-Free Number | Inception Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Invesco Small Cap Value A | 69.96 | 61.78 | 0.03 | Edwards/Mueller | 6/25/2010 | 1.120 | 0.250 | N | Y | 800 959-4246 | 6/21/1999 |
| 2 | Invesco Small Cap Value R6 | 72.02 | 65.04 | 0.24 | Edwards/Mueller | 6/25/2010 | 0.730 | | Y | Y | 800 959-4246 | 2/7/2017 |

236.    Row one of the figure above depicts the Defendants' choice and its 5-Year Total return of 61.78%. The Defendants could have obtained a cheaper, different class with more yield and less cost (65.04% 5-Year total).

237.    The five year difference is 3.26% which is equal to 0.66% per year in missed opportunity costs. That amount is over twice the 12b-1 credit of 0.25%.

238.    The Defendants forced participants to give up a chance to make 0.66%/year more. In other words, they paid sixty-six basis points and received a revenue sharing credit of twenty-five basis points year after year. That equals forty-one basis points year after year of more costs on participants' accounts—without considering the portfolio manager's compensation and the trading activity costs.

239.    This same math regarding revenue sharing applies to every fund in this plan and for which a portfolio manager is paid.

**DEFENDANTS' INVESTMENT MANAGEMENT PROCESSES PREFERRED FUNDS WITH PORTFOLIO MANAGER'S COMPENSATION**

240.    The Defendants' processes should have a factor to calculate the cost and benefit of pursuing funds that continually take fees for portfolio managers' salaries and their trading activity. The Prudent Investor Rule (Restatement Third) states

trustees must determine (at the moments they made or reviewed fund selections or retentions) that "gains from the course of action in question can reasonably be expected to compensate for its additional costs and risks." Restatement (Third) of Trusts Cmt. h(2).

241.   Based on the Defendants' actions from their certified filings with the federal government, the Plaintiffs infer Schenker never cared about the Prudent Investor Rule or ERISA's "sole and exclusive" rule.

## THE "BENEFITS" TO BE PURSUED BY ERISA FIDUCIARIES AS THEIR "EXCLUSIVE PURPOSE" DOES NOT INCLUDE "NONPECUNIARY BENEFITS."—LIKE REVENUE SHARING

242.   The Supreme Court unanimously held in the context of ERISA retirement plans that only the beneficial interests of participants/beneficiaries can be considered. Trustees must focus solely on "financial" rather than "nonpecuniary" benefits. The "benefits" to be pursued by ERISA fiduciaries as their "exclusive purpose" does not include "nonpecuniary benefits." (see *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014)).

243.   The U.S. Department of Labor's (DOL) longstanding and consistent position is that when making decisions on investments and investment courses of action, plan fiduciaries must be focused solely on the plan's financial returns, and the interests of plan participants and beneficiaries in their benefits must be paramount.

244.   Since 1994, the Department's emphasis on the primacy of plan participants' economic interests has stayed constant. The DOL has consistently stated that the paramount focus of plan fiduciaries must be the plan's financial returns and providing promised benefits to participants and beneficiaries. The DOL has explained that a fiduciary acts prudently if she determines that an investment is appropriate based solely on economic considerations.

245.   Pension plans and other benefit plans covered by ERISA, however, are bound by statute to a narrower objective: Prudent management with an "eye single"

to maximizing the funds available to pay benefits under the plan. Donovan v. Bierwirth, 680 F.2d at 271.

246.   ERISA plan fiduciaries may not subordinate return or increase risks to promote non-pecuniary objectives. The duty of loyalty—a bedrock principle of ERISA, with deep roots in the common law of trusts—requires those serving as fiduciaries to act with a single-minded focus on the interests of beneficiaries. See Unif. Prudent Inv. Act section 5 cmt. (1995) ("The duty of loyalty is perhaps the most characteristic rule of trust law."); see also Susan N. Gary, George G. Bogert, & George T. Bogert, The Law of Trusts and Trustees: A Treatise Covering the Law Relating to Trusts and Allied Subjects Affecting Trust Creation and Administration section 543 (3d ed. 2019).

> . . . [a] trustee is held to something stricter than morals of the market place. . . . Uncompromising rigidity has been the attitude of the courts of equity when petitioned to undermine the rule of undivided loyalty.

*Justice Cardozo's classic statement in Meinhard v. Salmon*, 249 N.Y. 458, 464 (1928).

247.   The duty of prudence prevents a fiduciary from choosing an investment alternative that is financially less beneficial than reasonably available alternatives. These fiduciary standards are the same, no matter the investment vehicle or category.

248.   The fundamental principle is that an ERISA fiduciary's evaluation of plan investments must be focused solely on economic considerations that have a material effect on the risk and return of an investment based on appropriate investment horizons, consistent with the plan's funding policy and investment policy objectives.

249.   The corollary principle is that ERISA fiduciaries must never sacrifice investment returns, take on additional investment risk, or pay higher fees to promote non-pecuniary benefits or goals.

250.   Investment course of action means any series or program of investments or actions related to a fiduciary's performance of the fiduciary's investment duties and includes the selection of an investment fund as a plan investment. ERISA Section 404(a)(1)(A) prohibits fiduciaries from subordinating the interests of participants to unrelated objectives and bars them from sacrificing investment return or taking on additional investment risk to promote non-pecuniary goals.

251.   As many courts have required, Plaintiffs consistently compared the Defendants' fund's underperformance to a "meaningful benchmark" under the facts and "circumstances prevailing at the time of the conduct."

### ANALYSIS AND DEMONSTRATION OF THE DEFENDANTS' IMPRUDENT CHOICE, JANUS HENDERSON BALANCED T

252.   Plaintiffs demonstrate another fund in the figure below that Defendants added to the participants' menu (based on the Defendants' 2020 financial reporting).

253.   The Defendants' choice was the "T" share class. At the time of their selection and monitoring conduct, there were two more identical funds they could have selected. The probable returns, income (yield), and the lower expenses were more favorable for other classes yet they were ignored by Defendants.

**Figure 8, 2019 prospectus data**

| | *Notes | Name | Expense Ratio | 12-Month Return | 3-Year Total | 5-Year Total | Yield 12-Month | Manager Name | Manager Start Date |
|---|---|---|---|---|---|---|---|---|---|
| 1 ▶ | Defs' choice | Janus Henderson Balanced T | 0.820 | 9.96 | 40.94 | 45.51 | 1.71 | Pinto/Buckley/Saigal/Watters | 5/1/2005 |
| 2 ▶ | Cheaper, identical | Janus Henderson Balanced I | 0.640 | 10.16 | 41.66 | 46.80 | 1.86 | Pinto/Buckley/Saigal/Watters | 5/1/2005 |
| 3 ▶ | Cheaper, identical | Janus Henderson Balanced N | 0.570 | 10.17 | 41.93 | 47.21 | 1.92 | Pinto/Buckley/Saigal/Watters | 5/1/2005 |

254.   Restatement (Third) of Trusts requires trustees to <u>avoid any investment that is not reasonably expected to generate returns sufficient to cover its costs</u>.

255.   Here, the Defendants breached their duties by failing to have a careful, reasoned process for deciding upon and carrying out their investment strategy. They also failed to monitor the funds they selected for the Plan menu and failed to replace their imprudent selections with prudent ones.

256.   As noted above, in deciding whether to pursue such an expensive and risky strategy (paying portfolio manager's compensation daily from investors' earnings), Schenker was obligated, first, to determine that the "gains from the course of action in question [could] reasonably be expected to compensate for its additional costs and risks."  Restatement (Third) of Trusts § 90 cmt. h(2).

257.   Faced with this data, Schenker should have proceeded with great caution, knowing that using portfolio managers such as those in these funds' demonstrations was a high-stakes, low-percentage bet (using the trust's money). Nevertheless, Schenker, Inc. heedlessly made that bet while playing with the trust's assets and, eventually, the participants' salary savings dollars.

## MODERN PORTFOLIO THEORY (MPT) AND THE PRUDENT INVESTOR RULE (RESTATEMENT THIRD)

258.   Prudent conduct under ERISA requires adherence to Modern Portfolio Theory. That is because the Secretary of Labor may prescribe such regulations as he finds necessary to carry out the provisions of ERISA. 29 U.S.C. § 1135. In 1979 the Secretary prescribed regulations under ERISA, further defining a fiduciary's investment duties. 29 C.F.R. § 2550.404a-1. In general, the regulations provide that the fiduciary shall be required to act as a prudent investment manager under the Modern Portfolio Theory rather than under the common law of trusts standard, which examines each investment with an eye toward its individual riskiness.

259.   When the "fiduciary hat" is on, the requirements that decisions be made "solely in the interest" and for "the exclusive purpose" of benefiting participants place a duty on the trustees to avoid placing themselves in a position where there is a conflict of interest between what is in the best interest of the beneficiaries and what is the best interest of the company.  *Varity Corp. v. Howe*, 516 U.S. at 524–25.

260.   Where ERISA is silent, courts look to trust law. A trustee is obligated not only to make prudent investment decisions but also to monitor and review those investments "in a manner that is reasonable and appropriate to the particular

investment action, and strategies involved." Id . at 1828 (quoting Restatement (Third) of Trusts, § 90, Comment b, p. 295 (2007).

261.   In other words, "the trustee must 'systematic[ally] conside[r] all the investments of the trust at regular intervals to ensure that they are appropriate." Id . (quoting A. Hess, G. Bogert, & G. Bogert, Law of Trusts and Trustees § 684, pp. 147-148 (3d. ed. 2009).

262.   Therefore, even if an initial investment decision were made outside of the six-year statutory period specified by ERISA, 29 U.S.C. § 1113 (1), if plan fiduciaries did not "conduct the sort of review that a prudent fiduciary would have conducted," regarding the investment within that time period, they breached their fiduciary duty of prudence. Tibble v. Edison, 135 S. Ct. at 1829.

263.   The Defendants displayed no evidence of following or complying with Restatement (Third) of Trusts (since their financial statements were submitted to the U.S. Departments of Treasury and Labor for the 2009 plan year beginning 1/1/2009).

264.   The Defendants' actions repeatedly violated the two-pronged test of Restatement (Third) of Trusts: "to the extent, an investment strategy involves extra management, tax, and transaction costs or a departure from an efficiently diversified portfolio, that strategy should be justifiable in terms of…a realistically evaluated prospect of enhanced return [from the strategy]." Edward C. Halbach, Jr., the Reporter for the Restatement and Walter Perry Johnson professor of law emeritus at the University of California law school, in "Trust Investment Law in the Third Restatement," Real Property, Probate and Trust Journal, Volume 27, Fall 1992, pages 407-65; see Section 227 of the Restatement 3rd of Trusts (Prudent Investor Rule), comment f, page 25.

## EXCESSIVE FEES BEYOND NECESSARY AND REASONABLE TO GREENLEAF ADVISORS LLC, THE PLAN ADVISOR

265.   ERISA accordingly holds fiduciaries "to a high standard of care and diligence" regarding fees paid to an advisor like Greenleaf:

1

2    Fiduciaries must, among other things, "[e]stablish a prudent process for
     selecting investment options and service providers"; "[e]nsure that fees
3    paid to service providers and other plan expenses are reasonable in light
4    of the level and quality of services provided"; and "[m]onitor
     investment options and service providers once selected to make sure
5    they continue to be appropriate choices."

6    U.S. DOL, EBSA, *A Look at 401(k) Plan Fees*, pp. 1-2 (Aug. 2013), Employee
7    Benefits Sec. Admin., U.S. Dep't of Labor, Meeting Your Fiduciary Responsibilities
     5 (Sept. 2020), https://go.usa.gov/xARbV.

8

9        266.   And the Department of Labor's regulation is consistent in that paying

10   for providers through revenue sharing can, without careful monitoring, lead to

11   unreasonable fees. The Department has directed that, to ensure that fiduciaries do not

12   cause their plan to engage in transactions prohibited by ERISA, see 29 U.S.C. 1106,

13   1108, fiduciaries who pay providers via revenue sharing must in certain

14   circumstances obtain "a reasonable and good faith estimate of the cost to the covered

15   plan of such recordkeeping services." 29 C.F.R. 2550.408b-2(c)(1)(iv)(D)(2).

16       267.   That estimate must take into account:

17

18       . . .the rates that the covered service provider, an affiliate, or a
19       subcontractor would charge to, or be paid by, third parties, or the
20       prevailing market rates charged, for similar services for a similar plan
21       with a similar number of covered participants and beneficiaries.

22   Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77
23   Fed. Reg. 5632, 5632 (Feb. 3, 2012).

24

25       268.   The Department has explained that "plan fiduciaries need this
26   information when selecting and monitoring service providers, to satisfy their
27   fiduciary obligations under ERISA." Reasonable Contract or Arrangement Under
28   Section 408(b)(2)—Fee Disclosure, 77 Fed. Reg. 5632, 5632 (Feb. 3, 2012).

**TWO REPEATED FAILURES FOR MOST SELECTIONS**

269.  The Defendants regularly failed to select (1) managers with skill to cover their extra compensation and trading costs as well as (2) the lowest cost class for participants They regularly deviated from the Prudent Investor Rule (Restatement Third).

270.  Defendants chose to levy (1) revenue sharing and (2) portfolio manager's compensation on the trust and participants because they apparently needed revenue sharing credits to use to keep costs from participants and/or paying the covered service providers' costs from Schenker's corporate income.

271.  Under 29 U.S.C. §1106(b) [ERISA §406(b)], fiduciaries are prohibited from engaging in self-dealing with Plan assets. Section 1106(b) prohibits self-dealing by a plan fiduciary regarding plan assets. Id. § 1106(b). Specifically, it states that a fiduciary shall not (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

**THE DEFENDANTS' BEHAVIOR EQUALS SELF-DEALING EVIDENCE**

272.  The Defendants did the opposite—and sought funds that offered them revenue sharing credits. They failed to "avoid unnecessary costs." In fact, their own filings prove they acted/wanted revenue sharing or additional wasteful costs.

> Revenue sharing has been billed as a "major expense" item that is "the dirty little secret of the mutual fund industry." According to one source, "the sums are enormous," aggregating more than $2 billion annually.

John P. Freeman, "The Mutual Fund Distribution Expense Mess" on 6/28/2007, The Journal of Corporation Law).

273.   However, it is well known in the mutual fund industry that the government authority for approval to launch an open-end mutual fund is the U.S. Securities and Exchange Commission (SEC). The SEC has stated [emphasis added]:

> The Commission may file enforcement actions alleging violations of these provisions against investment advisers that fail to disclose to their clients conflicts of interest, *including those conflicts associated* with the receipt of 12b-1 fees for investing client funds in, or *recommending that clients invest in, a 12b-1 fee paying share class* when a *lower-cost share class was available to clients for the same fund.*

274.   The SEC continues:

> A 12b-1 fee is a fee paid by a mutual fund on an ongoing basis from its assets for shareholder services, distribution, and marketing expenses. Each share class of a fund represents an interest in the same portfolio of securities.  Therefore, when there is a lower-cost share class available that does not charge a 12b-1 fee (or charges a lower 12b-1 fee), it is usually in the client's best interest to invest in the lower-cost share class rather than the 12b-1 fee paying share class because the client's returns would not be reduced by the 12b-1 fees.

https://www.sec.gov/enforce/announcement/scsd-initiative

275.   It is imperative to note that all share classes' assets are used by a portfolio manager to buy a stock/bond. Thus, each purchase has the same "cost basis" and that is why a line chart at yahoo or google shows each share class' line on top of the other classes of a fund—their price or NAV "delta" (changes) match.

276.   That is precisely why the Court in Tibble II noted that plan administrators must switch to lower-cost institutional funds immediately. The same should have occurred here. Broadly speaking: "[a] breach of trust is a failure by the trustee to comply with any duty that the trustee owes, as trustee, to the beneficiaries * * * of the trust." Restatement (Third) of Trusts § 93 (2003).

**FAILURE TO LOYALLY SELECT AND MONITOR TRUST INVESTMENTS –
FAILURE TO PRUDENTLY INVESTIGATE, SELECT AND MONITOR TRUST
INVESTMENTS**

277.   Under the relevant ERISA provisions, "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). Subsection one imposes fiduciary status on those who <u>exercise discretionary</u> authority, <u>regardless of whether such authority was ever granted</u>; [s]ubsection three describes those individuals who have actually been granted discretionary authority, <u>regardless of whether such authority is ever exercised</u>.

278.   Plaintiffs requested the Plan and Trust's (1) ERISA Budget Account information (Bookkeeping Spending Accounts (Fee Recapture)) from Schenker, as well as Greenleaf's mutual fund selling agreements. A mutual fund is an SEC-registered open-end investment company that pools money from many investors and invests the money in stocks, bonds, short-term money-market instruments, other securities or assets, or some combination of these investments. Fund "selling agreements" state what the specific "soft-dollar" fund compensation will be (SEC Rule 12b-1 fees, sub-transfer agency fees, shareholder servicing fees or other types of fees (revenue sharing). The amount of revenue sharing received varies from one underlying investment option to another.

279.   Mutual funds disproportionately and non-uniformly pay covered service providers' compensation, and some fund families like Dimensional and the Vanguard Group Inc. pay no revenue sharing to providers (and hence, no fees are deducted from participants' accounts).

280.   Thus, more sophisticated participants/beneficiaries electing zero revenue sharing funds may pay very little administrative cost or they may avoid any administrative costs for their accounts ever.

281.   The more assets a participant has, the higher her revenue sharing cost is (since it is part of the expense ratio of the fund and the fund fees are based on assets). Plaintiffs also note the Defendants' IRS approved plan document relating to 26 CFR § 1.401(a)(4)-4(a) [emphasis added]:

> This section provides rules for determining whether the benefits, rights, and features provided under a plan (i.e., all optional forms of benefit, ancillary benefits, and other rights and features available to any employee under the plan) are made available in a nondiscriminatory manner. Benefits, rights, and features provided under a plan are made available to employees in a nondiscriminatory manner only if each benefit, right, or feature satisfies the current availability requirement of paragraph (b) of this section and the effective availability requirement of paragraph (c) of this section. Paragraph (d) of this section provides special rules for applying these requirements. Paragraph (e) of this section defines optional form of benefit, ancillary benefit, and other right or feature.

282.   Use of revenue sharing in Schenker, Inc. 401(k) Savings and Investment Plan also violates "uniform fiduciary standards to prevent transactions which dissipate . . " and [emphasis added]:

> The objectives of these provisions are to make applicable the law of trusts; . . to establish uniform fiduciary standards to prevent transactions which dissipate or endanger plan assets; and to provide effective remedies for breaches of trust.

Statement of the Honorable Harrison A. Williams, Jr., 120 Cong.Rec. S-15737, August 22, 1974, Reprinted [1974] U.S. Code Cong. Admin. News, pp. 5177, 5186.

283.   Relating to fund selling agreements and their soft dollar compensation to covered service providers, Plaintiffs' experts found publicly available service agreements for recordkeepers (because compliance officers typically approve a

1  "template contract" from which client contracts are constructed. Plaintiffs infer
2  similar language was used by the Defendants).

3      284.  These agreements state that plan sponsors must acknowledge that they
4  have read, understood and "received copies of the prospectuses for all mutual fund
5  investments" the Defendants choose to use.

6      285.  Plaintiffs' allegations, when read as a whole, demonstrate circumstantial
7  facts that show the Defendants utilized an imprudent process (1) in their selections
8  and retentions (monitoring) of the Plan's investment and (2) covered service
9  providers.

10  **SCHENKER'S FORMS 5500, ANNUAL RETURN/REPORT OF EMPLOYEE**
11                      **BENEFIT PLAN**

12     286.  Evidence from the Defendants' own Forms 5500 points to a concerted
13  focus on (1) a mutual fund's ability to "kick-back" monetary credits that the
14  Defendants could use to (2) pay their chosen covered service providers and (3) not
15  on the merits of the investment itself and (4) not based on the beneficial interests of
16  the participants/beneficiaries.

17     287.  Kick-backs in the form of SEC Rule 12b-1 fees, sub-transfer agency
18  fees, shareholder servicing fees, commissions, finder's (incentive) fees or other types
19  of fees were the "guiding compass" for selection/retention—not the
20  participants'/beneficiaries' best interests nor the interests of the Plan and Trust.

21     288.  Fiduciaries need not set out to enrich themselves in order to violate
22  ERISA's duty of loyalty--benefiting a third party over the Plan participants is also a
23  violation.

24     289.  The Defendants' actions were taken (1) to save themselves costs at the
25  expense of Plan participants and/or (2) to favor its investments over the Plan
26  participants. Either reason is inconsistent with the duty of loyalty. (See *Creamer v.*
27  *Starwood Hotels & Resorts Worldwide, Inc*. 2017 WL 2909408 (C.D. Cal. May 1,

28

1  2017) (not necessary to allege that excessive recordkeeping and administrative fees

2  benefitted anyone to state breach of duty claim)).

3  290.  Defendants in cases like this have often argued that they deliberately

4  chose the more expensive share class because it was more "liquid." They argued no

5  harm occurred because they (1) ensured the recordkeeper received the maximum full

6  revenue sharing that was deducted from participants'/beneficiaries' accounts and then

7  they directed the recordkeeper to (2) credit every penny back to the exact participant

8  that paid the revenue sharing.

9  291.  This cannot be true because the Defendants' audited annual financial

10  statements and every one of their fund's SEC-prospectuses at www.sec.gov/edgar

11  stated that all trust investments were held in the trust's "nominee name" and traded

12  "omnibus" or at a trust/custodian level. Each mutual fund's RIC (registered

13  investment company) prospectus is clear in saying the funds have no way to know

14  shareholders at the participant level—that is, who at Schenker owned a single share

15  of their mutual fund.

16  **DEFENDANTS IN OTHER CASES STATE THERE IS MORE "LIQUIDITY"**

17  **IN REVENUE SHARING CLASSES**

18  292.  Every share class' portfolio manager and holdings are identical—the

19  fund's classes trade omnibus (in aggregate, for all classes of the manager's fund)

20  daily at 4 p.m. Defendants' attorneys often argue the "A" version is more "liquid."

21  293.  There is no difference in "liquidity." Plaintiffs note the "A" version's

22  price (NAV) is less due to the extra costs levied on the trust's investments every day.

23  294.  The cheaper "I" class has 535.8M in assets versus the Defendants' "A"

24  version (122M) because most investors know the yield and returns are much more

25  significant if they buy the cheaper class (returns and costs are negatively correlated).

26

27

28

**Figure 9**

| | Assets ($millions) | Net-Asset Value | Initial Purchase | *Notes | Name |
|---|---|---|---|---|---|
| 1▶ | 122.0 | 39.27 | 1,000 | Defendants' | Gabelli Small Cap Growth A |
| 2▶ | 535.8 | 41.03 | 10,000 | | Gabelli Small Cap Growth I |

The SEC-prospectus at www.sec.gov/edgar waives minimums for "omnibus trusts" and (2) expenses and returns for A and I are printed on the same page of the prospectuses.

**DEBUNKING CONVENTIONAL WISDOM ABOUT REVENUE SHARING**

295.   For example, the cheaper "I" class in the figure below (available to the Defendants at all times since they added the "A" class) of the Gabelli Small Cap Growth fund (added by the Defendants prior to 1/1/2009) earned 6.46% over a 10 year period ending 11/30/2022. That is equivalent to 0.646% more return annually—much more than the annual revenue sharing credit of twenty-five basis points ("12b-1 Fees" of 0.25%/yr). The Defendants' actions forced participants to pay 64 cents per dollar invested (in lost returns) in order to "credit" the Defendants 25 cents.

296.   Figure 10 proves that but for the Defendants' negligent selection and monitoring processes, participants could have earned a 12-month yield of 0.25%/yr in the "I" ("institutional") class versus almost zero percent in the "A" class.

297.   The Defendants repeatedly retained the "A" class since 2009 and failed over and over to spend 5 to 15 minutes and call 800-422-3554 (to exchange the more costly "A" class of the Gabelli Small Cap Growth fund for the "I" class).

298.   Plaintiffs infer that the Defendants' kept retaining the loaded "A" class because they could benefit from its "12b-1" kick-back and direct it to pay covered service providers. They did this repeatedly, even though the kick-back eroded almost all of the yield versus the identical "I" class.

299.   Stated differently, the Defendants pursued revenue sharing or "nonpecuniary benefits" called revenue sharing. Responsible plan fiduciaries must evaluate the investment alternatives based solely on pecuniary factors. Schenker

often subordinated the interests of the trust and participants to unrelated objectives—
they sought more costly, less beneficial classes and sacrificed yields and investment
returns. The Defendants also cause participants harm by taking on additional
investment risk to promote non-pecuniary objectives.

**Figure 10, data as of 11/30/22**

| *Notes | Name | 10-Year Total | Yield 12-Month | Manager Name | Manager Start Date | 12b-1 Fees | True No-Load | Telephone Switch | Toll-Free Number | Inception Date |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 Defendants' | Gabelli Small Cap Growth A | 160.56 | 0.01 | Gabelli/Grender | 10/22/1991 | 0.250 | N | Y | 800 422-3554 | 12/31/2003 |
| 2 | Gabelli Small Cap Growth I | 167.02 | 0.25 | Gabelli/Grender | 10/22/1991 | | | Y | 800 422-3554 | 1/11/2008 |

300.   Tibble v. Edison explains:

> [C]ost-conscious management is fundamental to prudence in the
> investment function, and should be applied not only in making
> investments but also in monitoring and renewing investments. A
> fiduciary's decision to invest in a fund that charges higher fees to
> a beneficiary will shrink the beneficiary's original investment.

Tibble v. Edison Int'l, No. CV-07-5359-SVW (AGRx), 2017 WL 3523737, at *10-
11 (C.D. Cal. Aug. 16, 2017) (internal quotation marks and citation omitted).

> Beneficiaries subject to higher fees for materially identical funds
> lose not only the money spent on higher fees, but also 'lost
> investment opportunity'; that is, the money that the portion of
> their investment spent on unnecessary fees would have earned
> over time.

Tibble v. Edison Int'l, 843 F.3d 1187, 1198 (9th Cir. 2016) (citation omitted).

> A fiduciary would have no reason not to switch to an identical
> share class fund.

CLASS ACTION COMPLAINT

*Braden v. Wal-Mart Stores*, 588 F.3d 585, 596 (8th Cir. 2009) (finding inference of flawed review process where specific identical institutional shares were available); *Tibble v. Edison Int'l*, 07 cv 5359 (SVW)(AGRx), 2017 WL 3523737, at *12-13 (C.D. Cal. Aug. 16, 2017) (determining a prudent fiduciary would switch to identical lower-cost share classes immediately).

301.    Repeated breaches in choosing investments were found by viewing in the initial selections of all of the mutual funds with portfolio manager's compensation. Second, the Plaintiffs' experts reviewed quarters after selection, including since 2016, and the Defendants' chosen/retained portfolio managers never demonstrated skill against their broad-based securities market index. Plaintiffs evaluated the Defendants' selection and retention actions using prospectus data at the time of the Defendants' conduct because ERISA Section 404(a)(1)(B) requires a plan fiduciary to act "with the care, skill, prudence, and diligence <u>under the circumstances then prevailing</u> that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

302.    The Schenker plan fiduciaries must always "thoroughly investigate the merit of each decision affecting the plan." *Sweda v. University of Pa.*, 923 F.3d 320, 329, 2019 EBC 158780 (3d Cir. 2019), cert. denied, 206 L. Ed.2d 496 (2020); *Tatum*, 761 F.3d 346; *Allison v. Bank One–Denver*, 289 F.3d 1223, 27 E BC 2746 (10th Cir. 2002); *Donovan v. Cunningham*, 716 F.2d 1455, 1467, 4 EBC 2329 (5th Cir. 1983).

303.    Plaintiffs infer from facts certified to the U.S. Departments of Treasury and Labor that the Defendants' choices of investments were always burdened by kick-backs of some sort. This means the Defendants' self-interest was the common denominator for every fund with portfolio manager's compensation offered.

304.    Evidence of hard-dollar remuneration for the Defendants' benefit has been offered here. Evidence of soft-dollar remuneration to the Defendants is harder

to prove, especially when they are in a superior position and failed to provide Plaintiffs their requested plan documents. Plaintiffs cannot be expected to rule out every possible lawful explanation for the Defendants' conduct challenged here but the thread Plaintiffs found relates not to the potential economic benefit to the trust or participants but to the benefit of the Defendants.

305. Essential features of this complaint, the Plaintiffs' lack of a free choice and transparency, arise from facts indicating the Defendants occupied a superior position to that of the Plaintiffs. The Defendants make all the decisions and keep both their basis and rationale unavailable to the harmed parties.

306. Evidence of the Defendants' flawed processes coupled with their non-feasance (repeated failures to act) is a direct and proximate cause of the harm and breaches of fiduciary duty. Plaintiffs and the Class have lost millions of dollars, for which the Defendants are jointly and severally liable.

## ANSWERS WERE IN PLAIN SIGHT OF THE DEFENDANTS

307. The Plaintiffs' allegations do not suggest Defendants should have scoured the market to find the cheapest funds available. There was no need to "scour" the market because the facts are overwhelming that the same higher cost funds selected/retained by the Defendants (1) appear on the same pages of their respective prospectuses at the SEC's website and (2) a cheaper class was always available at the time of the Defendants' conduct. *Kruger, et al. v. Health, Inc*., 131 F.Supp.3d 470, 476 (M.D.N.C. 2015) ("Plaintiffs are not arguing that Defendants had a duty to scour the market to find and offer any cheaper investment. Instead, Plaintiffs allege that 'lower-cost funds with the identical managers, investments styles, and stocks' should have been considered by the Plan.").

308. In the Tibble v. Edison Int'l line of cases, the district court ultimately recognized that the "decision to invest in retail-class shares instead of institutional-class shares of the same fund violated [the] duty of prudence." *Tibble v. Edison Int'l*, 2017 WL 3523737 (C.D. Cal. Aug. 16, 2017).

309.  All share classes could have been purchased by the Defendants without meeting any minimum amount of assets because this plan's funds all waived the their minimums.  As stated in prospectuses listed at www.sec.gov/edgar for this plan, every RIC (registered investment company) has stated all minimum purchase requirements were waived for "QUALIFIED RETIREMENT PLANS (QRP) AND "OMNIBUS TRUSTS."

## MORE SPECIFIC FUND COMPARISONS

310.  In fund comparisons that follow, Plaintiffs' experts used benchmarks matching the requirements of the SEC as well as 29 CFR § 2550.404a-5 ("an appropriate broad-based securities market index)."  These benchmarks are also required (1) by the Prudent Investor Rule (Restatement Third) Modern Portfolio Theory (MPT) and (2) used in the SEC reportings filed by the portfolio manager (such a "bogey or benchmark" is also used by the respective RIC (registered investment company) to determine their portfolio manager's compensation).  29 CFR § 2550.404a-5 [emphasis added]:

> (d) Disclosure of investment-related information. The plan administrator (or person designated by the plan administrator to act on its behalf), based on the latest information available to the plan, shall* * * (1) Information to be provided automatically. Except as provided in paragraph (i) of this section, furnish to each participant or beneficiary on or before the date on which he or she can first direct his or her investments and at least annually thereafter, the following information with respect to each designated investment alternative offered under the plan * * * (iii) Benchmarks. For designated investment alternatives with respect to which the <u>return is not fixed</u>, the <u>name and returns of an appropriate broad-based securities market index</u> over the 1-, 5-, and 10-calendar year periods (or for the life of the alternative, if shorter) comparable to the performance data periods provided under paragraph (d)(1)(ii)(A) of this section, and <u>which is not administered by an affiliate of the investment issuer, its investment adviser, or a principal underwriter, unless the index is widely recognized and used</u>."

311. Based on information and belief, the Defendants' and Greenleaf's quarterly investment monitor reporting and processes avoided a thorough review of their recommended funds' "performance versus benchmarks."

**U.S. SECURITIES AND EXCHANGE COMMISSION REQUIRES USE A BROAD-BASED INDEX, IN LIEU OF PEER GROUP COMPARISONS**

312. From the Division of Investment Management (U.S. Securities and Exchange Commission, 100 F Street, N.E., Washington, D.C. 20549) Amy Miller wrote on August 11, 2016 [emphasis added]:

> This language, although from a "dated" release, is still the standard with respect to defining an "appropriate securities index" under Section 205(b) and is quoted at length by both the SEC Staff and no-action letter applicants.

313. The SEC explained in their "Disclosure of Mutual Fund Performance and Portfolio Managers" (SEC Rel. No. IC-19832 (Apr. 6, 1993)) that it chose to require funds to use a broad-based index in lieu of peer group comparisons "to provide investors with a benchmark for evaluating fund performance that affords a greater basis for compatibility than a narrow index would afford."

314. In rejecting the use of peer group comparisons for all funds, the SEC stated that "[t]he index comparison requirement is designed to show how much value the management of the fund added by showing whether the fund 'out-performed' or 'under-performed' the market, and not so much whether one fund 'out- performed' another." (Disclosure of Mutual Fund Performance and Portfolio Managers, SEC Rel. No. IC-19832 (Apr. 6, 1993)).

315. The SEC Form N-1A used to launch a mutual fund (https://www.sec.gov/files/formn-1a.pdf) defines "appropriate broad-based securities market index" to mean an index "that is administered by an organization that is not

1    an affiliated person of the Fund, its investment adviser, or principal underwriter,

2    unless the index is widely recognized and used."

3        316.    The SEC has stated that "[t]he purpose of including return information

4    for a broad-based securities market index was to provide investors with a basis for

5    evaluating a fund's performance and risks relative to the market."

6        317.    SEC Rule 156 requires mutual funds to tell investors not to base their

7    expectations of future results on past performance before they invest. The SEC

8    requires firms comparing returns to (1) avoid conflicts of interest and (2) use a

9    broad-based securities market index to be selected that is closely aligned with the

10   Fund's principal investment strategies.

11       318.    Notably, the index must be calculated and administered by an

12   organization unaffiliated with the Fund, its investment adviser and principal

13   underwriter. Specifically: "To prevent a conflict of interest from arising, the index

14   must be created and administered by an organization that is not an affiliated person

15   of the fund, its adviser or principal underwriter…." Disclosure of Mutual Fund

16   Performance and Portfolio Managers, Investment Company Act Rel. No. 19382

17   (Apr. 6, 1993) (citing potential conflicts of interest as the primary reason for

18   requiring a broad-based securities market index to be administered by an unaffiliated

19   third party, unless the index is widely recognized and used, in which case the

20   potential for conflict is diminished because the index is used for purposes other than

21   as a benchmark against which to measure fund performance).

22       **PEERS VERSUS BROAD-BASED SECURITIES MARKET INDEX**

23       319.    It takes little more than common sense to understand the conflicts of

24   interest Schenker and Greenleaf possessed when using peers for evaluating their

25   prior selections/retentions.

26       320.    Based on information and belief, the Defendants used (1) short-term

27   managers' performance to choose/keep funds in violation of 17 CFR § 230.156 as

28   well as (2) "peers" in their decision-making processes and the Defendants (3)

predominately chose funds with kickbacks or revenue sharing. Long term performance is known to participants when looking at the Defendants' only index fund in 2016/2017. Due to securities lending revenue, the four basis points in cost is sometimes made up so the index fund's true cost can be zero. This is exemplified by looking at the 10 and 15 Year averages below of the index fund at row1 versus its appropriate broad-based securities market index.

321.   Row 1 v. row 2 is not a "peer" comparison. However, looking at the Defendants' equivalent Large Cap Blend non-index fund (with 0.43%/yr in portfolio manager's compensation; GE State Street Instl US Lg-Cp Core Eq Inv (removed in 2017)), we find why Schenker prefers comparing to "peers" (row 3). The 12-Month Return, el al. look less bad. Back when Schenker probably added it, the 15-year number made this manager look attractive to them (short-term look back then).

| | Name | 12-Month Return | 3-Year Average | 5-Year Average | 10-Year Average | 15-Year Average | 20-Year Average | 20-Year Total |
|---|---|---|---|---|---|---|---|---|
| 1 | Vanguard Institutional Index I | 1.77 | 11.79 | 11.55 | 7.01 | 5.99 | 8.01 | 366.96 |
| 2 | S&P 500 TR USD | 1.78 | 11.82 | 11.58 | 7.01 | 5.99 | 7.98 | 364.37 |
| 3 | Large Blend Average | -1.70 | 9.76 | 9.86 | 6.20 | 5.75 | 7.74 | 344.05 |
| 4 | GE Instl US Large Cap Core Eq Inv | -3.58 | 9.29 | 9.07 | 7.03 | 6.06 | | |

## THE DEFENDANTS' REPLACED THEIR BETTER-PERFORMING CORE BALANCED FUND

322.   A demonstration of this fact and other concerns about the Defendants' loyalty, care and skill is illustrated in the table below. This data was derived from the prospectus' year during which the Defendants acted to select and add this fund (2019) to the participants' limited menu of choice. This Janus fund replaced the only balanced fund selected earlier (Oakmark, on the Defendants' 2009 Form 5500).

323.   Not only did the Defendants (1) fail to select the better share class (the "I costing 0.64% instead of 0.82% and yielding 1.86% versus 1.71%), (2) they replaced a more seasoned balanced fund manager that (1) cost less (0.59% versus

0.82%) and (2) with more assets and (3) a manager with a better 20-year total return of 402.89% (versus their choice at 272.76%) and (4) a  higher yield.

324.    The Defendants focused on the short term performance (3 year and 5 year numbers). Lower costs (expense ratios) and higher yields are better predictors for future performance according to trust law and Nobel Laureates. William F. Sharpe, 1990 Nobel Laureate: "The key issue is that past performance is a thin reed for how to predict future performance. Expense ratios and turnover are generally better predictors."

325.    The bolded information is noteworthy. This selection also shows they clearly deviated from the plan's documents on investment selection in 2020.

| Name (added on 2020 Form 5500) | *Notes: bolded=worse | Expense Ratio | 3-Year Total | 5-Year Total | 20-Year Total | Yield 12-Mo | Manager Start | Assets ($millions) |
|---|---|---|---|---|---|---|---|---|
| Janus Henderson Balanced T | Defs' choice | **0.82** | 40.94 | 45.51 | **272.76** | **1.71** | 5/1/2005 | **5,452.90** |
| Oakmark Equity And Income | Replaced fund | 0.59 | **31.15** | **28.21** | 402.89 | 1.76 | 11/1/1995 | 9,713.40 |

326.    Trust Restatements require trustees [emphasis added]:

…to observe how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation, but in regard to the permanent disposition of their  funds, considering the probable income, as well as the probable safety of the capital to be invested.

Restatement Second of Trusts section 227.

327.    Thus, trustees are [emphasis added]:

…to make such investments and only such investments as a prudent man would make of his own property having in view the <u>preservation of the estate</u> and the <u>amount and regularity of the income to be derived</u>.

Id.

328.  But for the Defendants' actions, if they had kept the replaced fund in 2020 and on, the trust's variance or risk would have been less and the 12-month return (as of 11/30/2022) and other returns after adding this fund would have grown participants' accounts much more.

**Figure 11, data as of 11/30/22**

| Name | Risk Adjusted Rating | 12-Month Return | Yield 12-Month | 2022 | 2021 |
|------|------|------|------|------|------|
| 1 ▶ Janus Henderson Balanced T | B | -11.48 | 0.88 | -13.83 | 17.04 |
| 2 ▶ Oakmark Equity and Income Institutional | A | -5.29 | 1.17 | -8.88 | 21.83 |

329.  The Defendants' processes failed to prudently determine that an investment is appropriate when responsible plan fiduciaries make decisions that are (1) <u>based solely on economic considerations</u> (2) <u>without regard to any collateral benefits the investment may also promote</u>. A prudent fiduciary continually evaluates the risk and return profiles of their current and future alternative investments.

330.  In other words, the Defendants' investment additions and retentions were not focused on pecuniary (or "risk-return") factors. The Defendants' actions do not reflect a concern for the economic merits of the investment. Their certified Forms 5500 evidence overwhelmingly proves the Defendants' acted to add funds because of "collateral benefits" in the form of revenue sharing. That was the Defendants' core selection/retention factor from January 1, 2009 until 12/31/2021.

**REVIEWING DEFENDANTS' GABELLI SMALL CAP GROWTH AND PRUDENTIAL JENNISON MID CAP GROWTH FUNDS UNDER THE CIRCUMSTANCES PREVAILING AT THE TIME**

331.    Using SEC-prospectus data as of 12/31/2018, Plaintiffs discovered the Defendants' failures were not only in not selecting the cheaper identical share class, but moreover, the Defendants' kept the Gabelli Small Cap Growth fund when the portfolio manager could not consistently beat its primary prospectus benchmarks. It would have been beneficial for the trust and participants'/beneficiaries' accounts to buy the benchmark for four basis points instead of spending 1.41%/year on portfolio manager's compensation and revenue sharing.

332.    Plaintiffs note below that if the responsible plan fiduciaries had simply prudently monitored the fund using the 2018 data, they would have removed the fund because the portfolio manager created variance risk and the fees kept the net returns less than the appropriate benchmark.

333.    Gabelli Small Cap Growth A was listed on the Schenker 2009 plan year Form 5500. Prudential Jennison Mid Cap Growth A was also listed on the same government filing. Ten years later, during the Defendants' 2019 fund review, the most expensive share classes ("A") remained and the Defendants ignored identical cheaper classes. The Defendants kept both classes of funds.

334.    The Prudential Jennison Mid Cap Growth A review in 2019 is exemplified below using prospectus data as of 12/31/2018. Row 1 was the Defendants' choice in 2009 and it is self-evident that if the Defendants' investment policy was ERISA-compliant, they should have replaced this manager years before. The managers lagged behind the 12-Month Return, the 3-Year Total, and 5-Year Total returns. Total returns consider compounding effects.

335.    Thus, lagging numbers can be easily used to calculate harm. Row 1 three year total return difference is -13.34%--which is -2.67%/year.

336.    The Defendants' reported $6,319,796 in assets on their government reporting in 2019 for their PGIM Jennison Mid Cap Growth A fund. Hence, the trust loss for three years is equal to ($843,060.79). This number is derived from taking the assets and multiplying them by the lag (6,319,796 times -13.34%).

CLASS ACTION COMPLAINT

337. Similarly, if one participant invested $10,000 in this fund three years earlier (2016), the Defendants' failure to act harm for three years for only this fund would be -1,334 dollars.

**Figure 12, prospectus data EOY 2018**

| | *Notes | Name | 12-Month Return | 3-Year Total | 5-Year Total | Manager Name |
|---|---|---|---|---|---|---|
| 1 | 1-Defs' choice | PGIM Jennison Mid-Cap Growth A | -8.45 | 16.23 | 23.43 | Mullman/Prasad/Bryan |
| 2 | 2-cheaper, same fd | PGIM Jennison Mid-Cap Growth R6 | -8.02 | 17.89 | 26.42 | Mullman/Prasad/Bryan |
| 3 | | Mid-Cap Growth Average | -6.58 | 24.05 | 32.68 | |
| 4 | | Morningstar US Mid Growth TR USD | -3.16 | 29.57 | 41.24 | |

338. Gabelli Small Cap Growth A earned less for total returns of 3-year, 5-year and 10-year than either of its 29 CFR § 2550.404a-5 "appropriate broad-based securities market index."

**Figure 13, data as of 12/31/2018**

| Name | 3-Year Total | 5-Year Total | 10-Year Total |
|---|---|---|---|
| Gabelli Small Cap Growth A | 18.13 | 17.74 | 201.55 |
| Russell 2000 Growth TR USD | 23.33 | 28.42 | 255.41 |
| Russell 2000 TR USD | 23.74 | 24.08 | 209.75 |

339. Plaintiffs believe that Greenleaf and the responsible plan fiduciaries at Schenker used "peer based" evaluations and not the one required by (1) the SEC and (2) or by 29 CFR § 2550.404a-5, (3) or by the Prudent Investor Rule (Restatement Third) called the "appropriate broad-based securities market index comparisons."

340. Plaintiffs sent written requests for investment monitoring reporting to Schenker but their requests were denied. Based on information and belief, to make their investments look better, the responsible plan fiduciaries and Greenleaf emphasized a "peer-based" investment scoring system (instead of one focused on "benchmark index" performance). This imprudent evaluation method would shield all fiduciaries and obfuscate the trust's assets' true benchmark lag and lost opportunity costs.

341.   For example, the Gabelli Small Cap Growth's website uses the Russell 2000 (blend) for comparison (https://www.gabelli.com/funds/open_ends/443). Therefore, Plaintiffs' experts used the year-end 2018 data again to illustrate the comparison of peers (Small Blend Average) versus an appropriate broad-based securities market index in Figure below. Looking back at the 3 years of 2018, 2017 and 2016 responsible plan fiduciaries note the A class fund's 5 year toal of 17.74% which is closer to the 18.12% peer return than the 24.08% five year total of the benchmark in the prospectus.

**Figure 14**

| Name | 3-Year Total | 5-Year Total | 10-Year Total |
|---|---|---|---|
| Gabelli Small Cap Growth A | 18.13 | 17.74 | 201.55 |
| Gabelli Small Cap Growth I | 19.00 | 19.17 | 209.48 |
| Russell 2000 TR USD | 23.74 | 24.08 | 209.75 |
| Small Blend Average | 19.32 | 18.12 | 205.68 |

## TWO CRITICAL SELECTIONS/RETENTIONS ERRORS COMMONLY MADE BY SCHENKER

342.   In reviewing the Defendants' management of the trust as far back as possible Plaintiffs can better understand that it was quite typical to note the Defendants regularly made negligent choices to offer participants a fund (1) where the portfolio managers lagged behind their own SEC-prospectus benchmark, but also where their choice was (2) predominately a more expensive share class of a fund.

343.   Also, section 7 of the Uniform Prudent Investor Act states: "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obliged to minimize costs."

The greater the trustee's departure from one of the valid passive strategies, the greater is likely to be the burden of justification [for

selecting an active investment strategy] and also of continuous monitoring [of it].

Reporter's General Note on Section 227 of the Restatement 3rd of Trusts (Prudent Investor Rule), comments e through h, page 79.

344.   The Defendants' departed radically from the Prudent Investor Rule (Restatement Third) above by forcing participants to pay portfolio manager's compensation from earnings whether or not the manager brought value to the participants.

345.   The Defendants' actions to predominately choose mutual funds with portfolio manager's compensation and trading costs meant they created extra, self-imposed heightened "justification burdens" as well as "monitoring burdens" on themselves under the Prudent Investor Rule (Restatement Third).

**MULTIPLE PROCESS FAILURES NOTED SINCE 2009**

346.   Yet the Defendants' actions failed in several ways because they (1) not only chose a bad portfolio manager who took fees (but did not earn them) but the Defendants also (2) would select/retain the more expensive class, which was (3) much more concentrated. Their actions created more trust variance (standard deviation) and risks of loss for the Plan and Trust. In summary, the Defendants' process was to:

(1) chose trust investments that used humans who quit every eight years and

(2) charged fees even though they added no value to those paying the fees and

(3) who had the capacity to watch over fifty or so stocks and

(4) this decision created extra uninvested cash

(5) which caused a lag behind the broad-based securities market index

347.   In Figure 9 below, Plaintiffs complain about another fund's manager when he concentrated almost 35% of the participants' cash in only ten stocks. The total number of stocks in a primary benchmark in 2018 was 500 stocks (S&P 500)

and an alternative benchmark was 3,000 stocks (Russell 3000) from the 9/30/2022 fact sheet at https://www.allspringglobal.com/.

**Figure 15 data as of EOY 2018**

| Top-10 Holdings Percent | Number of Holdings | Name | 3-Year Total |
|---|---|---|---|
| 34.95 | 97 | Wells Fargo Growth Admin | 34.34 |
| 34.95 | 97 | Wells Fargo Growth R6 | 35.40 |

348.   In the figure above Plaintiffs prove the Defendants' chosen "Administrator Shares" version's portfolio managers fared no better than in Figure below from the fund's website:

**Figure 16, fact sheet as of 9/30/2022**

| Total returns (%) | 3 Month | Year to date | ANNUALIZED | | | | Gross expense ratio |
|---|---|---|---|---|---|---|---|
| | | | 1 year | 3 year | 5 year | 10 year | |
| Administrator Shares | -5.12 | -38.03 | -38.34 | 2.58 | 7.92 | 9.81 | 1.08 |
| Institutional Shares | -5.07 | -37.92 | -38.19 | 2.80 | 8.15 | 10.05 | 0.83 |
| Russell 3000® Growth Index[2] | -3.37 | -30.57 | -23.01 | 10.16 | 11.57 | 13.36 | – |

**DISCOVERY WILL REFLECT THE DEFICIENCIES NOTED IN THIS COMPLAINT ARE PLAN WIDE AND SYSTEMIC, APPLICABLE TO MOST IF NOT ALL OF THE DEFENDANTS' CHOSEN AND RETAINED MUTUAL FUNDS**

349.   These comparisons used here for the Defendants' Gabelli Small Cap Growth A fund also apply to the Defendants' other choices listed on the 2009-2021 Forms 5500--except the one token Vanguard index fund listed on Ms. Cynthia DeGalleford, Director Benefits, Annual Return/Report of Employee Benefit Plan for 2016 filed with the U.S. Departments of Treasury and Labor on 8/17/2017.

350. Plaintiffs infer the Defendants' fund selections/retentions process must not have considered their funds' appropriate benchmarks. Instead, they likely used "Peer" comparisons. Thus, they compared returns to other expensive mutual funds' managers' performance (not the SEC-prospectus at www.sec.gov/edgar indexes like the "S&P 500" or "Russell 1000").

351. That action hid the actual harm the trust was incurring by not simply buying the indexes they could not beat. There are over 1,000 mutual funds that mimic every major index and the cost is insignificant (four or five basis points for core equities or less).

352. When managers could not beat their chosen benchmarks, the Defendants should have allowed the participants/beneficiaries to buy that same benchmark for four basis points (virtually free ($40 or less per $100K)). Schwab and Fidelity launched zero-fee ETF and fund indexes several years ago.

353. The Defendants' choice of the "cleanest shirt in a pile of dirty laundry" means they never read their chosen mutual funds' SEC-prospectus at www.sec.gov/edgar.

354. The Defendants could have improved their knowledge from the summer 2021 reporting by S&P Dow Jones Indices LLC's "SPIVA Scorecard" (by Berlinda Liu, CFA Director Global Research & Design, berlinda.liu@spglobal.com and Gaurav Sinha, Managing Director Global Research & Design, gaurav.sinha@spglobal.com, data as of June 30, 2021) that summarizes:

> Past performance is no guarantee of future results. Of the 31 distinct benchmarks tracked by this report, 27 finished with a positive return over the year; the exceptions were among longer-term fixed income indices. The positive market performance broadly translated into good absolute returns for active fund managers. But relative returns continued to disappoint; in 15 out of 18 categories of domestic equity funds, the majority of actively managed funds underperformed their benchmarks. The performance was particularly underwhelming in the small-cap space, as 78% of all small-cap funds lagged the S&P SmallCap 600® (see Report 1a)."

CLASS ACTION COMPLAINT

1

2       355.  Another source of knowledge is the 1990 Nobel Laureate William F.

3   Sharpe who explained the importance of avoiding peer group comparisons in "The

4   Arithmetic of Active Management" (The Financial Analysts' Journal (Vol. 47, No. 1,

5   January/February 1991. pp. 7-9; and (2) 7)):

6

7               'Peer group' comparisons are dangerous. Because the capitalization-

8               weighted average performance of active managers will be inferior….

9

10      356.  In doing so, Schenker and Greenleaf failed to put first the economic

11  interests of the plan in providing retirement benefits. "ERISA fiduciaries must

12  always put first the economic interests of the plan in providing retirement benefits. A

13  fiduciary's evaluation of the economics of an investment should be focused on

14  financial factors that have a material effect on the return and risk of an investment

15  based on appropriate investment horizons consistent with the plan's articulated

16  funding and investment objectives." U.S. Department of Labor Field Assistance

17  Bulletin 2018-01 (Apr. 23, 2018).

18      **PAST PERFORMANCE IS NO GUARANTEE OF FUTURE RESULTS**

19      357.  Plaintiffs' experts found copious evidence that the Defendants'

20  processes were flawed in another way. Their actions tended to chase the hottest fund

21  managers over the prior three and five years.

22      358.  Regarding  novice,  untested  managers,  Plaintiffs  provide  the

23  Defendants' funds' "manager tenure" for some of their chosen managers:

24

25 | | Start Date | Fund Name |
26 | A | 4/25/2014 | PGIM Quant Solutions Mid-Cap Val Z |
27 | B | 12/31/2015 | Janus Henderson Balanced T |
28 | C | 7/11/2018 | PGIM Jennison Mid-Cap Growth A |

CLASS ACTION COMPLAINT

| D | 3/31/2019 | T. Rowe Price New Horizons |

359.   In 2014, 2015, 2016 and 2017 plan years, failures to monitor were rampant when Schenker allowed workers to invest 6,591,595 dollars into an unproven manager. They finally acted to remove the first fund A in 2018.

360.   Fund B was added by the Defendants in 2020 when the manager's tenure was the 2016-2019 plan years. The Defendants replaced a fund manager who ran the same type of fund since 1995 ($5,046,070 in Oakmark Equity & Income Inv).

361.   Fund C had 8,207,576 participants' salary dollars invested in 2020 even though the manager started mid-year of 2018. The Defendants did nothing to warn participants and kept their salary dollars in the hands of this manager.

362.   Fund D was not removed from the plan after the former manager had been terminated or quit and the new manager started on 3/31/2019.

363.   Plaintiffs questioned the Defendants' selection processes for all periods—those processes that occurred before the limitations period too. Initial investment selection is a more burdensome process and all monitoring processes are derived from that initial investment selection occurrence.

364.   In 2018, the JPMorgan Intrepid Mid Cap was added to the participants' menu of choices. It did not replace an older investment. Plaintiffs do not have meeting minutes or a corporate resolution to understand the logic for this addition. However, the circumstances prevailing at the time of the conduct are listed below:

**Figure 17, data as of 2017**

| | Name | *Notes | 3-Year Total | 5-Year Total | 10-Year Total | 15-Year Total | 20-Year Total |
|---|---|---|---|---|---|---|---|
| 1 | JPMorgan Intrepid Mid Cap A | Oldest | 24.58 | 91.03 | 98.01 | 339.90 | 350.80 |
| 2 | JPMorgan Intrepid Mid Cap R6 | Defs' choice | | | | | |
| 3 | Mid-Cap Blend Average | | 26.62 | 84.65 | 98.78 | 358.22 | 400.86 |
| 4 | Morningstar US Mid Cap TR USD | | 33.54 | 99.48 | 122.79 | 461.45 | 430.38 |
| 5 | Russell Mid Cap TR USD | | 31.44 | 94.75 | 117.50 | 462.20 | 486.72 |
| 6 | S&P MidCap 400 TR | | 37.43 | 96.20 | 136.74 | 445.16 | 609.12 |

1

2      365.  The Defendants must have finally learned that choosing the lowest cost

3   share class is more prudent because they selected the R6 version. Nonetheless, they

4   failed to exchange any of their earlier, more costly selections or fix the harm caused

5   to separated participants in accordance with their Plan and Trust documents.

6      366.  The R6 version began operation on 11/2/2015, so performance history is

7   missing in Row 2. Thus, most prospectuses refer the investor back to the oldest share

8   class to evaluate the portfolio managers (the "A" class in this instance).

9      367.  ERISA's plain text thus establishes a clear rule that in the course of

10   discharging their duties, fiduciaries may never subordinate the economic interests of

11   the plan [participants and beneficiaries] to unrelated objectives.

12      368.  Using the facts, circumstances and data available to the Defendants at

13   the time of their actions, stated in Figure 13, no reasonable fiduciary could infer

14   economic reasons to add this fund to the participant's menu of choices. But that is

15   what the Defendants did in this case.

16             **THE DEFENDANTS' CORE PROBLEM—SELF-DEALING**

17      369.  Schenker sought funds with less economic and pecuniary benefits for

18   the trust and participants'/beneficiaries' accounts consistently and persistently.

19      370.  Richard H. Baker, Chairman of the House Subcommittee on Capital

20   Markets, Insurance, and Government Sponsored Enterprises, connected the "revenue

21   sharing dots" leading to investor deception when he said: "Revenue sharing is

22   generally not disclosed to investors, thus leaving investors unaware of the incentives

23   a broker may have for recommending one fund over another."

24      371.  Further, "Revenue sharing has been billed as a 'major expense' item

25   that is "the dirty little secret of the mutual fund industry."

26      372.  Fund managers' cavalier and intentionally vague handling of billions of

27   dollars of revenue sharing money can and has given rise to litigation asserting claims

28   under federal antifraud laws and investment company fiduciary duty principles. Rich

Blake, "How High Can Costs Go?", INSTITUTIONAL INVESTOR, May 1, 2001, at 56 states:

> The $2 billion spent yearly on revenue sharing was almost four times more than the fund industry spends on advertising. It is far more than the total expenses of all kinds borne by all mutual funds during 1980, the year when 12b-1 was adopted. Despite the enormity of revenue sharing payments, according to one source, the terms of revenue sharing dealings "are seldom codified in written contracts." It is troubling to find a highly regulated industry known to crow about its embrace of transparency and accountability spending billions of dollars annually on agreements that are seldom committed to writing. Big money contracts that are oral and thus invisible are breeding grounds for deceptive practices and fiduciary duty breaches.

373.    The amount of revenue sharing paid from Schenker, Inc. 401(k) Savings and Investment Plan and Trust varies from one fund family to the other. Each fund's board of directors can reduce the revenue sharing amounts any time with no warning.

374.    Therefore, some participants in the Schenker, Inc. 401(k) Savings and Investment Plan shouldered the burden of administration costs while others escaped entirely by the Defendants' choice of revenue sharing versus transparent invoicing and payments reflected on participants' statements.

375.    Small differences in investments' costs, such as a manager's fee of fifty basis points per annum, is equal arithmetically to at least ten percent (and possibly seventeen percent (.5/3 or .5/5)) of an investor's expected return per year.

> Cognizant of the impact of fees on Plan value, fiduciaries should be vigilant in "negotiation of the specific formula and methodology" by which fee payments such as "revenue sharing will be credited to the plan and paid back to the plan or to plan service providers."

DOL Advisory Opinion 2013-03A, 2013 WL 3546834, at *4.

1
2
3
>Fiduciaries must also consider a plan's "power ... to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected."

4
*Tibble v. Edison Int'l (Tibble IV )*, 843 F.3d 1187, 1198 (9th Cir. 2016).

5
6
7
8
>When expenses are paid from plan assets, fiduciaries must ensure that the assets are used "for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan."

9
DOL Advisory Opinion 2001-01A, 2001 WL 125092, at *1. See 29 U.S.C. § 1104(a)(1)(A).

10
11
>Fiduciaries must also understand and monitor plan expenses.

12
*Sweda v. Univ. of Penn.*, 923 F.3d 320, 328 (3d Cir. 2019).

13
14
15
16
>'Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan,' by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees."

17
*Id.* (quoting *Tibble*, 135 S.Ct. at 1826).

18
19
20
21
>Fiduciaries must also consider a plan's power to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected.

22
*Sweda v. Univ. of Penn.*, 923 F.3d at 328–29

23
24
25
26
27
28

**CLASS ACTION ALLEGATIONS**

376.  Plaintiffs bring this action in a representative capacity on behalf of the Plan and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a Class defined as follows: All participants in or beneficiaries of the Schenker, Inc. 401(k) Savings and Investment Plan from December 30, 2016 through the date of judgment,  (the "Relevant Time Period or Class Period").[2]

377.  29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

378.  This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a. The Class include over 10,000 members and are so large that joinder of all its members is impracticable.

b. There are questions of law and fact common to the Class because Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and made omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breaches of duty.

c. Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d. Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with any other member of the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

---

[2] Plaintiffs reserve their right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

1
2
3
4
5
6
7
8
9

e. Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

10
11
12
13
14
15
16
17
18
19

379. A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

20
21
22
23

380. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of December 31, 2020, the Plan had over 30,256 participants with account balances.

24
25
26
27

381. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class, which predominate over questions that may affect individual class members, include, *inter alia*:

28

(a) whether Defendants are fiduciaries of the Plan;

(b) whether Defendants breached fiduciary duties of loyalty and prudence with respect to the Plan;

(c) whether Defendants had a duty to monitor other fiduciaries of the Plan;

(d) whether Defendants breached their duty to monitor other fiduciaries of the Plan;

(e) the proper form of equitable and injunctive relief; and

(f) the proper measure of monetary relief.

382.   Plaintiffs' claims are typical of those of the Class because their claims arise from the same event, practice and/or course of conduct as other members of the Class.

383.   Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action litigation in general and ERISA class actions involving fiduciary breaches.

384.   Plaintiffs have no interests that conflict with those of the Class.

385.   Defendant does not have any unique defenses against any of the Plaintiffs that would interfere with their representation of the Class.

386.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be too small for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are not aware of any difficulties likely to be encountered in the management of this matter as a class action.

387.   In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the

1  Class, thereby making appropriate final, injunctive, declaratory, or other appropriate
2  equitable relief with respect to the Class as a whole.

3                              **FIRST CAUSE OF ACTION**
4            **VIOLATION OF 29 U.S.C. §§ 1104(A)(1)(B) AND 1105**
5    **(LIABILITY FOR BREACH OF CO-FIDUCIARY; DUTY OF PRUDENCE)**

6          388.   Plaintiffs repeat and reallege the above paragraphs as though fully set
7  forth herein.

8          389.   ERISA mandates that fiduciaries act with prudence in the disposition of
9  Plan assets and selection and monitoring of investments, as well as in the monitoring
10  and minimization of administrative expenses. 29 U.S.C. § 1104(a)(1)(B).

11         390.   In determining whether an ERISA fiduciary breached its duty of
12  prudence, courts focus on: "whether the fiduciary engaged in a reasoned decision-
13  making process, consistent with that of a prudent man acting in a like capacity.......
14  ERISA requires fiduciaries to employ appropriate methods to investigate the merits
15  of the investment and to structure the investment as well as to engage in a reasoned
16  decision-making process, consistent with that of a prudent man acting in a like
17  capacity." Tatum v. RJR Pension Inv. Comm., 761 F.3d 346, 356-58 (4th Cir. 2014).
18  Accord Fifth Third Bancorp v. Dudenhoeffer, 573 U.S. 409 (2014).

19         391.   In addition to a duty to select prudent investments, under ERISA, a
20  fiduciary "has a continuing duty to monitor [plan] investments and remove
21  imprudent ones" that exists "separate and apart from the [fiduciary's] duty to
22  exercise prudence in selecting investments." Tibble, 575 U.S. 523.  To satisfy its
23  duties under ERISA, a fiduciary simply may not argue that other funds, in
24  combination, theoretically create a prudent portfolio. DiFelice v. U.S. Airways, Inc.,
25  497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)."

26         392.   At all relevant times, Defendants were named and/or de facto
27  fiduciaries of the Plan within the meaning of ERISA insofar that they exercised

28

discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

393.  At all relevant times during the Class Period, Schenker (and its delegates) and Greenleaf, when selecting and retaining the Plan's investment lineup, deciding which funds to populate the limited Plan's menu of choices for workers, and retaining covered service providers, were ERISA fiduciaries.

394.  At all relevant times during the Class Period, Defendant Investment Fiduciaries, in recommending investment options to the Plan for valuable consideration, in recommending investment managers and subaccount managers for the Plan to Plan fiduciaries, and in having sufficient influence over Plan Fiduciaries with respect to their selection of investment options for the Plan, was an ERISA fiduciary.

395.  At all relevant times during the Class Period, the Trustee, having residual fiduciary responsibility for determining whether a given direction is proper and whether following the direction would result in a violation of ERISA, and in heeding the directions of Plan Fiduciaries with respect to the payment of unreasonable and unnecessary fees and expenses to Prudential and Defendant Investment Fiduciaries, was an ERISA fiduciary.

396.  As fiduciaries of the Plan, Defendants were subject to the ERISA's duty of prudence.

397.  Defendants breached this fiduciary duty in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan participants. Instead, the Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. Likewise, Defendants failed to monitor or control the grossly excessive compensation paid for adminstrative services. Moreover, Defendants failed to investigate the competence of and periodically monitor covered

service providers which they had selected to provide services to the Plan and Plan participants.

398.    Based on reasonable inferences from the facts set forth in this Complaint, at all relevant times during Class Period, Plan Fiduciaries failed to have a proper system of review in place to ensure that: (a) participants in the Plan were being charged appropriate and reasonable fees for the Plan's third-party service providers; (b) their selection and retention of investment options were prudent; (c) ensured all parties-in-interest were competent and free from self-interest; (d) and that Plan expenses were reasonable and necessary; and (e) they placed the interests of Plan participants and beneficiaries over the interests of hired covered service providers, and themselves.

399.    At all relevant times during the Class Period, Defendants did not have adequate procedures in place to monitor Plan service providers and investments and did not act in the best interests of the Plan participants.

400.    The United States Supreme Court held in Tibble that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones ... separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset."    575 U.S. at 529. "The trustee must systematically consider all the investments of the trust at regular intervals to ensure that they are appropriate." Id.

401.    Thus, to discharge this duty, Plan Fiduciaries must have had a prudent process and method for selecting, monitoring and retaining prudent, cost-effective investments for the Plan, and for removing imprudent investments.   As set forth below, this the Plan Fiduciaries here did not have.

402.    Plan fiduciaries are held to a "high standard of care and diligence" and must: (1) "establish a prudent process for selecting investment options and service providers;" (2) "ensure that fees paid to service providers and other expenses of the plan are reasonable in light of the of level and quality of services provided;" and (3)

1   "monitor investment options and service providers once selected to see that they
2   continue to be appropriate choices," among other duties. See A Look at Fee, supra.

3      403.   Prudence requires plan fiduciaries to monitor both the performance and
4   cost of the investments selected for their 401(k) plans, leveraging the size of their
5   plan to ensure that well-performing, lower cost investment options are available to
6   plan participants.

7      404.   Likewise, Plan Fiduciaries must be continually mindful of the
8   performance and cost of plan investment options to avoid undue risk to plan
9   participants' savings and to ensure that any fees paid are reasonable compensation
10  for the services provided. This includes fees from any plan service provider,
11  including the plan fiduciaries themselves.

12     405.   Plan Fiduciaries must also be wary of conflicts of interest that arise
13  when plan administrators and other fiduciaries select investment options for the plan
14  which include a remittance of a fee to the Plan sponsor, administrator, or investment
15  advisor, or another party otherwise affiliated with the Plan sponsor.

16     406.   Given the vulnerability of plan participants, who are dependent on the
17  retirement income earned by their Defendants' chosen plan investment choices, Plan
18  Fiduciaries also must be particularly vigilant about evaluating whether lower-
19  expense share classes are available to participants.

20     407.   Plan Fiduciaries had a fiduciary duty to monitor and evaluate the
21  performance of the Plan's investments they selected and retained, and to remove and
22  replace imprudent investments.

23     408.   Plan Fiduciaries did not have a prudent process for monitoring and
24  evaluating the performance of the Plan's investments.

25     409.   At all relevant times during the Class Period, the Plan's mutual funds
26  significantly underperformed their meaningful benchmarks.

27     410.   If Plan Fiduciaries had monitored and evaluated the performance of the
28  Plan's mutual funds, it would have known that those funds were consistently

1  underperforming both their SEC-prospectus benchmarks and benchmarks under 29
2  CFR § 2550.404a-5. Plan Fiduciaries did not know about, did not correct, and did
3  not prevent, the resulting losses to Plan participants.

4      411.  As a direct and proximate result of the breaches of fiduciary duties
5  alleged herein, the Plan and Plan participants suffered over $50 million in losses.

6      412.  Had Defendants complied with their fiduciary obligations, the Plan and
7  Plan participants would not have suffered these losses, and Plan participants would
8  have had more money available to them for their retirement.

9      413.  Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable
10 to restore to the Plan all losses caused by their breaches of fiduciary duties, and also
11 must restore any profits resulting from such breaches.

12     414.  In addition, Plaintiffs are entitled to equitable relief under 29 U.S.C. §
13 1132(a)(3) and other appropriate relief as set forth in their Prayer for Relief.

14     415.  ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for
15 another fiduciary of the same plan's breach: (A) if he participates knowingly in, or
16 knowingly undertakes to conceal, an act or omission of such other fiduciary,
17 knowing such an act or omission is a breach; (B) if he has enabled such other
18 fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other
19 fiduciary, unless he makes reasonable efforts under the circumstances to remedy the
20 breach.

21     416.  Defendants knowingly participated in each breach of the other
22 Defendants, knowing that such acts were a breach, enabled the other Defendants to
23 commit breaches by failing to lawfully discharge such Defendant's own duties, and
24 knew of the breaches by the other Defendants and failed to make any reasonable and
25 timely effort under the circumstances to remedy the breaches. Accordingly, each
26 Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. §
27 1105(a).

28

# SECOND CAUSE OF ACTION

## VIOLATION OF 29 U.S.C. §§ 1104(A)(1)(A) AND 1105
## (LIABILITY FOR BREACH OF DUTY OF LOYALTY)

417.   Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

418.   ERISA fiduciaries owe a duty of loyalty. 29 U.S.C. § 1104(a)(1)(A). The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. Pegram v. Herdrich, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." Id. at 224 (quotation marks and citations omitted).

419.   Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A (Dec. 19, 1988).

420.   At all relevant times, Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

421.   At all relevant times during the Class Period, the Defendants and the Committees, and its individual members, when selecting and retaining the Plan's investment lineup, deciding which funds to populate the limited menu of choices, and keeping covered service providers rather than soliciting requests for proposal, were ERISA fiduciaries.

422.   At all relevant times during the Class Period, Greenleaf for valuable consideration, and in exercising discretion and control over rebates and other Plan assets instead of returning them to the Plan and/or Plan participants, and in having sufficient influence over Plan Fiduciaries with respect to their selection of investment options for the Plan, was an ERISA fiduciary.

423.   At all relevant times during the Class Period, the Trustee, having residual fiduciary responsibility for determining whether a given direction is proper and whether following the direction would result in a violation of ERISA, and in heeding the directions of Plan Fiduciaries with respect to the payment of unreasonable and unnecessary fees and expenses to covered service providers, was an ERISA fiduciary.

424.   As fiduciaries of the Plan, Defendants were subject to the ERISA's duty of loyalty.

425.   Defendants breached their fiduciary duty of loyalty in multiple respects as discussed throughout. At all relevant times during the Class Period, Greenleaf made investment decisions and/or provided investment advice while tainted with self-interest.

426.   At all relevant times during the Class Period, Plan Fiduciaries put their interests ahead of those of the Plan and Plan participants by choosing investment products and services which generated substantial revenues at great costs to the Plan and Plan participants.

427.   Investment fund options chosen for a plan should not favor the fund provider and a party-in-interest over the plan's participants. Yet here, to the detriment of the Plan and its participants and beneficiaries, the Plan's fiduciaries endorsed Prudential's and Greenleaf's selling agreements with investment funds in the Plan, revenue sharing agreements between Prudential, Greenleaf and Schenker, in their own self interest. As a result, Plan participants were unaware of the excessive and unreasonable fees secretly charged to their accounts because of the Defendants.

428.   As a result of their conflicts of interest, Plan Fiduciaries selected and retained in the Plan many investment funds that were more expensive than necessary and otherwise were not justified on the basis of their managers and historical performance.   Plan Fiduciaries, moreover, hid these facts and the conflicts of interests from the DOL, IRS, and Plan participants and beneficiaries.

429.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered over $50 million in losses.

430.   Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the plan's providers.

431.   In addition, Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3) and other appropriate relief as set forth in their Prayer for Relief.

432.   ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

433.   Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

CLASS ACTION COMPLAINT

**THIRD CAUSE OF ACTION**

**FAILURE TO MONITOR OTHER PLAN FIDUCIARIES**

434.    Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

435.    Schenker had the authority to appoint and remove members of the Committees.

436.    Defendants also each had the authority to select service providers for the Plan. In light of this authority, Defendants each were a fiduciary of the Plan.

437.    As the appointing/selecting fiduciaries, Schenker and its board had a duty to monitor their appointees and providers they selected to ensure that they were adequately performing their fiduciary and non-fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that they were not fulfilling those duties.

438.    Schenker also had a duty to ensure that their appointees and Plan service providers they selected and retained possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; and maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments.

439.    Schenker and its members breached their fiduciary monitoring duties by, among other things:

> a. Failing to monitor and evaluate the performance of their appointees and Plan service providers, or have a system in place for doing so, standing idly by as the Plan and Plan participants suffered significant losses as a result of their imprudent actions and omissions;
> b. Failing to monitor the processes by which Plan investments were evaluated, and failing to investigate the availability of lower-cost separate account and collective trust vehicles; and
> c. Failing to remove Committee members and service providers who were incompetent, who charged excessive fees, and/or whose performance was inadequate.

440.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered over $50 million in losses.

441.   Had Schenker and its members complied with their fiduciary obligations, the Plan and Plan participants would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

442.   Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to monitor.

443.   In addition, Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3) and other appropriate relief as set forth in their Prayer for Relief.

444.   ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

445.   Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## FOURTH CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY BY OMISSION

446.   Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

447.   As fiduciaries of the Plan with the powers to bring actions on behalf of the Plan, Defendants had the ability to bring actions on behalf of the Plan pursuant to ERISA § 502(a)(2) and ERISA § 502(a)(3) at all relevant times during the Class Period.

448.   Among the assets of an employee benefit plan under ERISA is a "chose in action" – the right to bring an action to recover a debt, money or a thing – including to institute a lawsuit for a breach of fiduciary duties or other violations. ERISA fiduciaries are prohibited from engaging in transactions under ERISA § 406(a) or 406(b) unless there is an exception or exemption, and a claim can be brought on behalf of the Plan against an ERISA fiduciary who engages in such prohibited transactions.

449.   As a result, one of the assets of the Plan was a claim against Defendants for engaging in prohibited transactions for their own benefit as set forth in this Complaint.

450.   Each of them either knew (because they were parties to the transaction) or through a proper review would have discovered that Defendants engaged in prohibited transactions in violation of ERISA as set forth in this Complaint, because each of them had knowledge of the terms of these self-dealing transactions, or through a prudent and loyal investigation in their role as Plan fiduciaries would have discovered them.

451.   Defendants did not take any action, including any legal action, or exercised any other authority under the Plan or the Trust Agreement, to properly manage this choice in action.

452.   By failing to remedy these prohibited transactions on behalf of the Plan, including by, if necessary, bringing suit against Defendants through the present, Defendants violated ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A).

453.   Because their fiduciary duties included employment of legal advisors, Defendants failed to comply with ERISA § 404(a)(1) in the administration of their

specific responsibilities as fiduciaries, and this failure enabled the other Defendants to violate ERISA in their acquisition of unreasonable fees and Plan assets.

454.   As a direct and proximate result of these breaches by Defendants, the Plan suffered losses and/or Defendants obtained profits that rightfully belong to the Plan and its participants.

455.   Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the other Defendants.

456.   Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3) and other appropriate relief as set forth in their Prayer for Relief.

457.   ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

458.   Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## ENTITLEMENT TO RELIEF

459.   By virtue of the violations set forth in the foregoing paragraphs, Plaintiffs and the Class are entitled to sue each of the Defendants pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), for relief on behalf of the Plan as provided in

ERISA § 409, 29 U.S.C. § 1109, including for recovery of any losses to the Plan, the recovery of any profits resulting from the breaches of fiduciary duty, and such other equitable or remedial relief as the Court may deem appropriate.

460.   By virtue of the violations set forth in the foregoing paragraphs, Plaintiffs and the Class are entitled pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to sue each of the Defendants for any appropriate equitable relief to redress the wrongs described above.

461.   Plaintiffs allege a "cumulative" harm which implicates the pure form of the continuing violations doctrine. The injury claimed by each plaintiff repeats daily when mutual fund pricing is calculated. Thus, resulting from the cumulative impact of daily negative compounding over months and years of the Defendants' repeated flawed selection and monitoring processes. Participants/beneficiaries charge precisely the sort of continuous conduct accreting retirement account injury that justifies characterization as a continuing violation.

462.   The concept of "make-whole" relief under laws of equity are clear. Where a beneficiary claims to recover trust property, the fixed limitation period shall not apply. No limits of recovery of lost benefits to recover from the trustee apply if a timely claim is filed.  The reason for this exception under laws of equity is that the possession of the property by a plan fiduciary or trustee is never by virtue of any right of his own but is acquired initially for and on behalf of the beneficiaries. The trustee's ownership or possession is representative of the beneficiary's interest.

463.   The effect is that time does not run in the trustee's favor and against the property beneficiary. ERISA grants full damages and restitution to redress a fiduciary breach involving plan assets. Three remedies are the workhorses of ERISA litigation, although ERISA does grant less important remedies to enforce statutory penalties and the like. Together, they make up what the Supreme Court described as a "carefully integrated interlocking, interrelated, and interdependent remedial scheme, which is . . . part of a 'comprehensive and reticulated statute.'"

464.    Professor Dobbs, "[j]udicial remedies usually fall in one of four major categories: (1) Damages remedies, (2) Restitutionary remedies, (3) Coercive remedies . . . or (4) Declaratory remedies."

465.    ERISA clearly grants declaratory and coercive remedies, as an employee can bring an action "to clarify his rights to future benefits under the terms of the plan" and the court can "enjoin any act or practice which violates [ERISA] or the terms of the plan." The provisions also grant the ability to enforce the payment of promised benefits.

466.    Limiting our Plaintiffs to harms "suffered within the limitations period prior to suit would render their claims unintelligible and nugatory" for the injuries inflicted upon the plaintiff within the limitations period could only be understood and evaluated by reference to activity occurring outside of the period. (Kyle Graham, The Continuing Violations Doctrine, Vol. 43, p 289, Gonzaga Law Review (2008))

467.    Injuries stemmed from the cumulative impact of years of breaches for (1) lack of loyalty and (2) lack of care or skill (1104). Lost opportunity costs to have their ten years of average tenure at Schenker to accrue growth faster (from more interest, dividends, etc. as well as less burdens from fees such as manager fees and their related trading costs) is precisely the sort of continuous conduct accreting injuries that justifies characterization as a continuing violation. (See Highland Indus. Park, Inc. v. BEI Def. Sys. Co., 357 F.3d 794, 797 (8th Cir. 2004) ("[W]e know of no state whatever in which an injured party must know the full extent of the damages that it may recover before the statute of limitations begins to run on its claim."); WOOD, supra note 57, § 179 ("[i]n actions from injuries resulting from the negligence or unskillfulness of another, the statute [oflimitations] attaches and begins to run from the time when the injury was first inflicted, and.not from the time when the full extent of the damages sustained has been ascertained"). But see 54 C.J.S. Limitation of Actions § 204 (2005) ("Where a continuing tort causes a single, indivisible injury, the cause of action accrues at, and limitations begin to run from,

1    the time when the nature and extent of the damage are ascertainable, which may be

2    at the inception of the tort or not until the last date of the tortious conduct.").

3        468.   "[W]hen the acts or conduct are continuous on an almost daily basis, by

4    the same actor, of the same nature, and the conduct becomes tortious and actionable

5    because of its continuous, cumulative, synergistic nature, then prescription does not

6    commence until the last act occurs or the conduct is abated." Rodrique v. Olin

7    Employees Credit Union, 406 F.3d 434, 442 (7th Cir. 2005); see also Flowers v.

8    Carville, 310 F.3d l118, 1126 (9th Cir. 2002); Landman v. Royster, 354 F. Supp.

9    1302, 1315 (E.D. Va. 1973); Bustamento v. Tucker, 607 So. 2d 532, 542 (La. 1992)

10       469.   Our claims build upon a factual foundation laid outside of the

11   limitations period prior to suit. Courts have ruled that it would be unfair to allow the

12   plaintiff to recover only for the incremental worsening of his condition (lack of

13   growth of her salary savings) within the limitations period.

14       470.   Referring to the Supreme Court's Amara v. Cigna (2011) and LaRue v.

15   DeWolf (2008) decisions, the Defendants' violations are supported by the Court's

16   "make-whole" references. When combined with ERISA Section 409 requirements

17   (ERISA section 409(a) imposes personal liability on fiduciaries that breach their

18   fiduciary duties), restoration of the Defendants' harm to the Plan and Trust dovetails

19   with the pure form of the continuing violations doctrine and each element here

20   avoids giving the Defendants a "license" to perpetuate its misconduct.

21       471.   The Defendants' continuing violations we refer to here are "a

22   continu[ous] series of events gives rise to a cumulative injury." That is the gravamen

23   of our specific claims at issue—participants/beneficiaries seek the trustee/fiduciary

24   to restore under the laws of equity all trust damages so that the Plaintiffs' accounts

25   would reach the same levels as if the breaches never occurred. This is analogous to

26   treating the claim as continuing in nature. (Kyle Graham, The Continuing Violations

27   Doctrine, Vol. 43 p 293, Gonzaga Law Review (2008)).

28

**JURY TRIAL DEMANDED**

472.   Under Fed. R. Civ. P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

**PRAYER FOR RELIEF**

473.        Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request the Court:

- Certify the Class, appoint Plaintiffs as class representatives, and appoint Tower Legal Group, P.C. and The Sharman Law Firm as Class Counsel;
- Find and declare that Defendants have breached their fiduciary duties as described above;
- Find and adjudge that Defendants are liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;
- Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;
- Order Defendants to provide an accounting necessary to determine the amounts Defendants must make good the Plan under §1109(a);
- Find and adjudge that Defendants must disgorge all sums of money received from their use of assets of the Plan;
- Impose a constructive trust on any monies by which Defendants were unjustly enriched as a result of breaches of fiduciary duty or prohibited transactions, and cause Defendants to disgorge such monies and return them to the Plan;
- Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;
- Order equitable restitution against Defendants;

CLASS ACTION COMPLAINT

1    • Award to Plaintiffs and the Class their attorney's fees and costs under

2    29 U.S.C. §1132(g)(1) and the common fund doctrine;

3    • Order the payment of interest to the extent it is allowed by law; and

4    • Grant other equitable or remedial relief as the Court deems appropriate.

5  **PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL ISSUES SO TRIABLE BY**

6                                  **LAW.**

7

8  Dated:  December 30, 2022                **TOWER LEGAL GROUP, P.C.**

9

10

11                          By: _____

12                              JAMES A. CLARK

13                              RENEE P. ORTEGA
                               Attorneys for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT